In re COMARK, Debtor.

Sam JONAS, Chapter 7
Trustee, Plaintiff,

v.

FARMER BROS. CO., Defendant.

Bankruptcy No. SA 82–03850JB.
Adv. No. SA 85–1162JB.

United States Bankruptcy Court,
C.D. California.

March 7, 1991.

Robin Campbell, Walker, Wright, Tyler & Ward, Los Angeles, Cal., for Farmer Bros. Co.

Thomas E. Garcin, Stutman, Treister & Glatt, Los Angeles, Cal., for Trustee Sam Jonas.

## MEMORANDUM OF DECISION

JAMES N. BARR, Bankruptcy Judge.

### SUMMARY

On June 9, 1982, eighty-four days before Comark was drawn into this Chapter 7 bankruptcy case involuntarily, it wired defendant Farmer Brothers Company (FBC) the sum of $4,963,351.25. The bankruptcy trustee (the Trustee) charges that the payment was a preferential repayment of debt.[1] FBC contends it was a payment from its stockbroker, Comark, "settling" the sale of securities for FBC's account, at FBC's request but in accordance with oral agreements ("repurchase agreements" or "repos") compelling Comark to do so. In that, FBC relies on 11 U.S.C. § 546(e) and (f) as a shield against the Trustee's powers.[2] FBC also challenged the adequacy of the Trustee's proof, and raised affirmative defenses afforded by Section 547(c).[3]

The evidence proves that the payment was a "preference," as defined in 11 U.S.C. § 547, but the Trustee may not recover those funds because FBC proved its defenses thereto are sound.

1. The Trustee seeks to avoid and recover the funds paid, in accordance with 11 U.S.C. §§ 547(b) and 550(a).

Section 547(b) provides:

Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under Chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

2. Section 546(e), added to the Code in 1982, and amended in June, 1990, reads:

Notwithstanding sections 544, 545, 547, 548(a)(2), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in section 741(5) or 761(15) 101(34), 741(5) or 761(15) of this title, or settlement payment, as defined in section 741(8) 101(35) or 741(8) of this title, made by or to a commodity broker, forward contract merchant, stockbroker, financial institution, or securities clearing agency, that is made before the commencement of the case, except under section 548(a)(1) of this title. [Strikeouts were deleted, and italicized portions were added by the 1990 amendments to Section 546.]

Section 546(f), added to the Code in 1984, reads:

Notwithstanding sections 544, 545, 547, 548(a)(2), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in section 741(5) or 761(15) of this title, or settlement payment, as defined in section 741(8) of this title, made by or to a repo participant, in connection with a repurchase agreement and that is made before the commencement of the case, except under section 548(a)(1) of this title.

3. FBC asserted that FBC and the Debtor intended the subject payment to be a "contemporaneous exchange for value given to the debtor," that there was, "in fact a substantially contemporaneous exchange," and that, therefore, the Trustee may not avoid the transfer to FBC on June 6, 1982. [11 U.S.C. § 547(c)]

It also asserted the affirmative defense afforded by Section 547(c)(2), which works to deny a bankruptcy trustee avoidance and recovery of an otherwise preferential transfer to the extent the debt repaid and the repayment were made "in the ordinary course of business or financial affairs of the debtor and the transferee ... and according to ordinary business terms." [See Footnote 4, below, for full text of that subsection.]

## JURISDICTION

This court has jurisdiction in this proceeding pursuant to 28 U.S.C. § 1334(a) (granting the district courts original and exclusive jurisdiction of all cases under Title 11); 28 U.S.C. § 157(a) (authorizing the district courts to refer all Title 11 cases and proceedings to the bankruptcy judges for the district); and General Order No. 266, dated October 9, 1984 (referring all Title 11 cases and proceedings to the bankruptcy judges for the Central District of California). This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

## STATEMENT OF FACTS

Comark was formed as a limited partnership in 1977. It was licensed as a securities broker, but did not "broker" the sale of securities between independent parties, for commissions. Instead, Comark became a dealer in securities under what are known as "repos" (Repurchase Agreements);[4] and attempted to become a player in the "Money Market."[5]

Typically, Comark would enter into a "reverse repo" by which it purchased a security for its own account.[6] Then it would "match" that "reverse" with a repo whereby it sold that security to one of its customers. The security would typically be transferred to Comark (either physically or through a "book entry" at the Federal Reserve Bank) and would usually remain in Comark's "clearing account" at Marine Midland Bank throughout the reverse repo and matching repo transaction, i.e., until the "back end" of the repo was settled by repayment of funds to the customer or by a "roll-over" of those funds into another repo or other transaction.

4. Marcia Stigums, a recognized authority on such matters, who testified as an expert at trial, explains in her book *The Repo And Reverse Market*, Dow Jones–Irwin, 1989, at page 4, *"Repurchase agreements (repos for short)* are contracts involving the *simultaneous sale and future repurchase* of an asset, most often Treasury securities. Typically, the seller buys back the asset at *the same price at which he sold it;* also, on the buy-back date, the original seller pays the original buyer *interest* on the implicit *loan* created by the transaction. Interest due on a repo at maturity is at the stated *repo rate* for the stated maturity of the repo."

The terms "repurchase agreement" is defined similarly in 11 U.S.C. § 101(43), which also recites that within the Code, the definition of "repurchase agreement" also applies to a *"reverse* repurchase agreement." That subsection was added to the Code in 1984 [then designated section 101(36) ], as an adjunct to Section 546(f) which was also added at that time.

Ms. Stigums explains a "reverse repo" as a standard repo transaction in which the repo market dealer or trader *purchases* the security for its own account. She notes, "Whenever a repo is structured so that a dealer, a bank, or another party that normally uses the repo market to *fund* (finance) itself is cast in the role of securities purchaser and money lender, the resulting transaction is known as a *reverse repurchase or simply as a reverse." id.* at p. 4.

In other words, the difference between a "repo" and a "reverse repo" is found solely in the role played by the securities broker/dealer in a given repo. Thus a "reverse repo" or "reverse" is *not* the *"back end"* of a repo (whereby the customer's security is sold and its funds are returned to the customer or "rolled over" into another transaction). The Senate Report on the enactment of what was to become Section 101(43), refers to the latter process as a *"reverse transfer,"* [S.Rep. No. 65, 98th Cong., 1st Sess. 69–71 (1983) ] but at trial all expert witnesses uniformly referred to it as the *"back end"* of the repo.

5. "Repos and reverses are strictly money market transactions, typically big ones: single repos for 500, even 800 million occur daily in the money market," Ms. Stigums explains. She goes on to note, "The U.S. money market is a huge and significant part of the nation's financial system in which banks and other participants trade hundreds of billions of dollars every working day. Where those billions go and the prices at which they are traded affect how the U.S. government finances its debt, how business finances its expansion, and how consumers choose to spend or save. *The money market is a wholesale market for low-risk, highly liquid, short-term IOUs. It is a market for various sorts of debt securities rather than equities." id.* pp. 1–2.

[See also *Matter of Bevill, Bresler & Schulman Asset Management Corporation,* 67 B.R. 557, 566–571 (D.N.J.1986), and *Bevill, Bresler & Schulman v. Spencer,* 878 F.2d 742, 745–746 (3rd Cir.1989) for an excellent description of the magnitude and importance of the money market and repos in the American economy; and of repo dealer practices.]

6. Most repos then, as now, involved U.S. Treasury Notes and other government securities; but bank certificates of deposit (CD's) and bankers' acceptances (BA's), as well as short term notes or "commercial paper" from major corporations were, and are, used as well.

The reverse repo price Comark paid for the security was usually slightly lower than the price at which it was sold to Comark's customer, and the difference was Comark's income from the transactions.

In such matched transactions, the same security was used to satisfy the back end of both the repo and the reverse repo. Under the reverse repo, Comark was obligated to deliver the security to the entity from which it was purchased, on the date agreed to at the time of the purchase; and under the corresponding repo, Comark was obligated to return the customer's money (which was often used to make the reverse repo purchase in the first place), on the predetermined date.

Comark had a "clearing account" at Marine Midland Bank and at Bradford Trust (i.e., whereby those banks agreed to hold securities deposited by Comark subject to its instructions). However Comark had no "safekeeping account" (i.e., whereby a financial institution might have agreed to hold securities owned by Comark's customers, segregated from Comark's securities and identified specifically to the customer's account). Marine Midland and Comark could each readily determine what securities were held in the clearing account on a given day, and the customer/transaction to which they related. Such scrutiny was important to both the bank and to Comark; for Comark used the securities in that account to collateralize its debt to Marine Midland and to conduct repo transactions with its customers. The account at Bradford Trust was seldom used by Comark, and the relationship there played no significant part in this adversary proceeding.

Comark routinely delivered repo securities to one of its "clearing accounts" upon their purchase of the securities by Comark or by its customer (unless the customer required physical delivery of the securities); and the clearing bank would hold them until it received further instructions from Comark as to their disposition.[7]

## THE REPOS

On June 1, 1982, with proceeds from the sale and/or maturity of other securities held for FBC, plus additional cash wired by FBC that day, Comark purchased, then sold to FBC, a $2,000,000.00 CD issued by the Industrial Bank of Japan (IBJ), for that amount; and a Federal National Mortgage Association (FNMA) bond, with a par value of $2,000,000.00, for $1,960,000.00, as part of two separate "open repos."[8] Comark agreed to repurchase those securities for the $3,960,000.00 paid by FBC, plus interest at about 12.25% per annum.

Two days later, while the IBJ and FNMA repos were still open, Comark and FBC entered into another open repo involving a Treasury Note, par value $1,000,000.00, which Comark sold to FBC for $990,000.00. Comark agreed to repurchase it for that amount plus about 13% interest.

The securities involved here, were delivered to Comark's clearing account at Marine Midland upon their purchase, and remained there until they were sold. All three repos remained open until June 9, 1982, when FBC put Comark to their obligation to repurchase those securities. Comark sold the subject securities that day. The next day, FBC's bank received all sums due from Comark (i.e., the $4,963,-351.29).

## THE TRUSTEE'S CASE IN CHIEF

 The Trustee met his burden of proving that the subject payment was a preferential transfer under Section 547(b) of the Code; for it proved that on June 9, 1982,

---

7. Some securities were not physically held in the "clearing account," but were, instead, transferred there by "book entry" only (i.e., by notation on the records of the Federal Reserve Bank which was confirmed to Comark and the clearing bank).

8. An "open repo" was defined at trial as a repo transaction which continues from day to day subject to termination by either party at any time. Marcia Stigums defines the term more precisely in her book, *The Repo and Reverse Markets*, Dow Jones–Irwin, 1989, at p. 353, as "a repo with no definite term. The agreement is made on a day-to-day basis and either the borrower or the lender may choose to terminate. The rate paid is higher than on [an] overnight repo and is subject to adjustment if rates move."

i.e., within 90 days before the date of the filing of the involuntary bankruptcy petition in this case, Comark transferred an interest of the debtor in property, to a creditor, on account of an antecedent debt owed by the debtor before the transfer was made and while the debtor was insolvent, and that the payment enabled that creditor (FBC) to receive more than it would receive in this Chapter 7 case had the transfer not occurred.

■ FBC asserted that it was not a "creditor," as that term is defined in 11 U.S.C. § 101(9) and as the term is used in section 547(b)(1); but FBC clearly had a valid "claim" to the funds which Comark paid it on June 9, 1982,[9] therefore, at that time, FBC was Comark's "creditor."

■ FBC's contention that the June 9, 1982 payment was not "on account of an antecedent debt" fails; for Comark was obligated to repay the subject funds to FBC when the repo transaction was initiated (i.e., on June 1, 1982 and June 2,

1982).[10] That is the very nature of repo transactions. Thus, an "antecedent debt" was extinguished with the subject payment.

Comark's solvency at the time of the subject transfer of funds, was raised by FBC; but it failed to overcome the presumption of insolvency derived from 11 U.S.C. § 547(f).

FBC received all that it was due from Comark on June 9, 1982, and FBC would not receive payment in full in this Chapter 7 case had they not been so paid.[11] Therefore, FBC's hope for a refuge within Section 547(b)(5), which measures a transfer against the creditor's aliquot share of a debtor's estate had the transfer not occurred, is also unavailing.[12]

However, despite its characterization as "preferential," the Trustee may not avoid that transfer; for FBC proved it is entitled to the insulation afforded by 11 U.S.C. § 547(c)(1) and (2).[13]

9. A "claim" is defined as "a right to payment ...," and neither the Trustee nor FBC contends that the latter had no *right* to the subject payment.

10. Whether the transactions in question were *investments* (as FBC urges), or simply "loans" (as the Trustee contends), they were made under an agreement by which Comark was to *repurchase* the subject securities; and that commitment was made *at the time FBC originally purchased them.* Therefore, Comark's obligations arose on June 1, 1982 and June 3, 1982, and were satisfied upon payment as required on June 9, 1982.

FBC's argument that there was no "debt" [i.e., "liability on a claim," per 11 U.S.C. § 101(11)] until FBC requested Comark *repurchase* the securities on June 9, 1982, is refuted by consistent expert testimony to the effect that repo dealers' obligations to its customers, in repo transactions, are fixed *when the transaction is opened.* That is one of the facets of a repo which sets it apart from the mere sale of a security, i.e., the seller's binding obligation to buy it back at a set price. (See *Matter of Bevill, Bresler, etc.,* 896 F.2d 54, 59 (3rd Cir.1990) wherein the court held that the obligation to re-deliver securities to a broker during the "back end" of a repo transaction is a "debt" for purposes of applying the setoff provisions of the Code [i.e., § 553]. The broker's obligation to the customer in such a situation is no less a "debt.")

In addition, recent case law has established that the meanings of "debt" and "claim," as used in the Bankruptcy Code, are coextensive. [See

*Pennsylvania Dept. of Public Welfare v. Davenport,* — U.S. —, 110 S.Ct. 2126, 2129, 109 L.Ed.2d 588, 595 (1990); and *Quintana v. Commissioner of Internal Revenue Service,* 915 F.2d 513, 516 (9th Cir.1990).] A "claim" is defined as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or right to an equitable remedy for breach of performance if such breach gives rise to a right to payment...." FBC had a "claim" against Comark for the moneys it paid to purchase the subject securities, on June 1, 1982 and June 2, 1982. Comark's "debt" to FBC arose at the same time.

11. The Trustee's evidence on that point was unrefuted.

12. *See infra* note 1 at p. 808, for text of Section 547(b)(5).

13. Sections 547(c)(1) and (2) read as follows:
 (c) The trustee may not avoid under this section a transfer—
 (1) to the extent that such transfer was
 (A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and
 (B) in fact a substantially contemporaneous exchange;
 (2) to the extent that such transfer was—
 (A) in payment of a debt incurred by the debtor in the ordinary course of business or

## ACKNOWLEDGEMENTS

Before discussing FBC's defenses to the trustee's action, I must pay homage to those who have laid the legal pavement through the money market maze. This portion of my opinion could justifiably be entitled "Bevill, Bresler, etc. Revisited" or perhaps "Shades of Bevill, Bresler," for both plaintiff and defendant variously relied upon or attempted to distinguish the opinion of the district court in *Matter of Bevill, Bresler & Schulman Asset Management Corp.*, 67 B.R. 557 (D.N.J. 1986), and the Third Circuit opinion in the case of *Bevill, Bresler & Schulman v. Spencer Savings & Loan*, 878 F.2d 742 (3rd Cir.1989).[14] And justifiably so. The district court opinion is an excellent discourse on the money market in general and on repos specifically. That court also provided the analytical spadework for part of my analysis of the parties' rights under 11 U.S.C. § 547(c)(1). The later appellate court opinion serves as an authoritative exposition, with an historical perspective, on congressional intent in enacting Sections 546(e) and (f).

## THE CONTEMPORANEOUS EXCHANGE FOR NEW VALUE DEFENSE

■ With regard to the applicability of Section 547(c)(1), I find there was a "contemporaneous exchange of new value" from FBC to Comark, June 9, 1982. FBC exchanged its rights in and to the securities

it purchased June 1 and 2, 1982, for the money it received a few days later.

Section 547(a)(2) defines "new value" to mean "money or money's worth in goods, services, or new credit, *or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under applicable law....*" [Emphasis added.]

The Trustee did not argue that the transfer in which FBC purchased the securities from Comark was a preferential transfer, or that it was otherwise avoidable; and, in fact, it was not.

The Trustee did argue, however, that because the securities were never "transferred" to FBC during the first half of the repos, Comark received no "new value" in exchange for the subject payment.

I find for FBC on that question, by recourse to nearly the same reasoning applied by the district court in *Matter of Bevill, Bresler & Schulman Asset Management Corp.*, 67 B.R. 557, 603–616 (D.N.J.1986).

There the court analyzed the New York and New Jersey versions of the Uniform Commercial Code, and concluded that (a) the debtor (AMC) was a "broker"/"financial intermediary" for purposes of applying those states' versions of UCC § 8–313(1)(c), and that (b) for transfer of the repo securities from the broker to its customers to have occurred, three requirements must have been met:

> financial affairs of the debtor and the transferee;
> (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
> (C) made according to ordinary business terms.

**14.** The circuit court case was more the outgrowth of the district court case cited here, than an appeal of the decision there. In the 1986 district court case, the trial court was faced with cross-motions for summary judgment by the bankruptcy trustee and numerous repo participants in two related bankruptcy cases (*see supra* at pp. 812–13 for a discussion of that relationship), seeking determination of the appropriate characterization of "repo transactions" (i.e., as

"sales" or "loans"), and a determination of ownership of repo securities.

The 1989 appellate decision refers to that earlier district court opinion for certain matters, but the opinion was rendered in different (later-filed) consolidated actions than those before the district court in the case cited here. The appellate decision arose from specific questions related to motions to dismiss those later actions, certified to the circuit court by the same judge who rendered the 1986 decision.

Ms. Stigums testified that she served as an expert in connection with the motions to dismiss from which the 1989 appeal was taken; and that her book, *The Repo and Reverse Markets,* cited above, was the result of an expansion of a report she wrote for the district court in that case.

(1) the broker/financial intermediary must send confirmation of the purchase;

(2) the broker/financial intermediary by book entry or otherwise must identify a specific security as belonging to the purchaser; and

(3) the security must be in the broker/financial intermediary's possession. *Id.* at 606.

The court there concluded that the customers in that case had no ownership interest in the repo securities, to the extent the securities were not held in a segregated "safekeeping" account; for the debtor (broker) there did not have sufficient indicia of control over securities in its "clearing account" to conclude that they were within the debtor's "possession." Without possession there was no "delivery" and thus no "transfer," reasoned the court. [See UCC § 8313.]

In that case, the clearing bank had a lien on securities in that broker's clearing account, to secure the broker's debt to the bank; and the clearing account agreement between those parties provided the bank with "total discretion to refuse to deliver securities or transfer them to safekeeping ... if [the bank] deemed itself to be less than adequately secured, and it could do so without notice to [the broker/debtor]." *Bevill, Bresler, etc.*, 67 B.R. at 610.

The California version of the applicable sections of the Uniform Commercial Code do not differ materially from the versions relied upon in *Bevill, Bresler, etc.*, and the facts here satisfy all the criteria applied by the district court in that case to establish that the subject securities were "transferred" to FBC prior to June 9, 1982.

■ It was proven that Comark never re-registered the securities or transferred them physically to FBC (or even to a segregated "safekeeping" account for FBC's benefit). However, as noted immediately above, "transfer" of securities may be accomplished by complying with the requisites of UCC § 8313.

Comark, admittedly a "broker," sent confirmations to FBC of its purchases of the subject securities;[15] Comark maintained sufficient records to satisfy the requisite of "identification" of the securities as being those of FBC;[16] and Comark had sufficient possession and control of the securities to satisfy the requisite of "possession" imposed by Cal. UCC § 8313. As to the latter conclusion, Comark's arrangement with Marine Midland Bank was similar to the relationship of Bevill, Bresler, etc. with its clearing bank, in that in both cases the broker's clearing bank had a lien on the securities on deposit in the broker's clearing account.[17] The difference here is the degree of control asserted by the bank over the securities in the clearing account.

■ No specific "clearing account agreement" existed between Comark and Marine Midland. At least none was put in evidence. However, there was a "General Loan and Security Agreement," dated January 21, 1981, between Marine Midland and Comark. By that agreement, the bank was granted "a security interest and a lien in

---

**15.** Note, that I address, here, just the *sale* of the subject securities to FBC by Comark; for my inquiry at this point is simply to determine if FBC had rights in the subject securities.

**16.** Most of the 125 trial exhibits were copies of "pencil tickets" (i.e., the first record made by Comark upon receipt of an order), "confirmations" (i.e., formal notice to the customer that the transaction had been made as requested, and an internal devise to document the transaction and initiate physical transfers of funds and/or securities), "Box Loan Reports" (i.e., a form of status report depicting the use to which given securities were being put on a given day), and reports from Comark's clearing bank as to the securities in Comark's clearing account, which were found within Comark's records.

Although there was testimony that Comark's records were not in good order, the volume and general clarity and extent of those used at trial belie the argument that the securities involved here were not "identified" as those subject to FBC's rights as a repo participant.

**17.** Unlike Bevill, Bresler, etc., Comark had no separate "safekeeping" account; but the brokers in both cases had a "clearing" account at a bank which used the securities therein as collateral for its loan to the broker. In the other case, the District Court concluded that securities held in the "safekeeping" account *were* transferred to the broker's customer; but those in the "clearing" account were not—because the bank controlled the securities in that account.

and upon any personal property of the undersigned or in which the undersigned may have an interest which is now or may at any time hereafter come into the possession or control of the Bank ... whether for the express purpose of being used by the Bank as collateral security or for safekeeping or for any other different purpose ..."

That agreement then goes on to provide the bank with various powers to sequester and liquidate such collateral as Comark might deposit with the bank, and those powers are summarized in the last sentence of the first paragraph of the agreement: "The undersigned hereby authorizes the Bank, in its discretion, at any time, whether or not the Collateral is deemed by it adequate, to appropriate and apply upon any of the Obligations, whether then due or not due, any of the Collateral of the undersigned and to charge any of the Obligations against any balance of account standing to the credit of the undersigned on the books of the Bank."

However, unlike the clearing account agreement in *Bevill, Bresler, etc.*, the agreement in this case does not grant Marine Midland the right to ignore Comark's instructions to transfer securities into or out of Comark's clearing account; and there was no evidence that such ever occurred. Only by foreclosing on the securities in that account could Marine Midland protect itself. And that is precisely what the bank did on June 4, 1982, when it liquidated most of the securities in the clearing account and used the proceeds thereof to pay its loan to Comark in full. Thereafter, it no longer had any control over the securities in Comark's clearing account, which included the subject securities held for FBC until the June 9, 1982,

transaction. Thus even if the General Loan and Security Agreement did deprive Comark of "control" over the subject securities, by June 4, 1982, Comark had obtained the control needed to accomplish transfer of the subject securities to FBC.

## THE ORDINARY COURSE OF BUSINESS DEFENSE

■ Section 547(c)(2) also provides a haven for FBC to the extent the June 9, 1982, payment to FBC was the repayment of a debt.[18] That section protects even a preferential transfer to the extent it was in the ordinary course of both the debtor's and the transferee's business or financial affairs, according to ordinary business terms, and in payment of a debt incurred in the ordinary course of the debtor's business or financial affairs within 45 days before the payment. [11 U.S.C. § 547(c)(2) ][19]

Comark and FBC regularly wired money back and forth from July 1981 through June 6, 1982, to the end that FBC could keep its available cash reserves earning interest daily, until it was needed for FBC's operations as a coffee producer/distributor. Comark regularly used FBC's funds to purchase securities, such as those involved here; then sold them when FBC needed cash. The debt satisfied by the subject payment was incurred by Comark in the regular course of its business as a broker/dealer; for it dealt extensively in money market transactions such as those here. Such transactions were common and "ordinary" in the conduct of the businesses of both FBC and Comark; and the transaction in question (i.e., the repurchase and payment to FBC) was made in accordance with ordinary business practices of those dealing in the money market at that time.[20]

---

18. As noted elsewhere in this opinion, a repo is a hybrid transaction, carrying the indicia of both a securities transaction and a loan. When Comark made the subject payment to FBC, it was the repayment of monies owed. *See infra* note 10 at p. 811.

19. Reference is made to the requisites of 11 U.S.C. § 547(c)(2) as it existed in 1982, when this case was commenced. In 1984, that section was amended to delete the requisite that payment be made within 45 days after the debt

repaid was incurred. The earlier version is applicable here.

20. In this regard, the Trustee presented extensive physical and expert testimonial evidence to prove that FBC did not know or care whether its transactions with Comark were "repos" or not; and that Comark did not keep "in safekeeping" the securities it used to make alleged repos, as it told FBC it would do. The Trustee then attempted to prove, by his experts, that a repo without delivery of the repo security to the

Finally, as noted earlier, the subject payment was made within 45 days after the debt was incurred.[21] Thus FBC is entitled to the protection of 11 U.S.C. § 547(c)(2).

In addition, I find within 11 U.S.C. § 546 another valid defense to the Trustee's action.

## THE MONEY MARKET DEFENSE

Trustee's counsel used the word "repos" to describe the parties' transactions, with the greatest reluctance. But there was no other way to tag the transactions; for the evidence was overwhelming that all three were conducted as "repos" and considered such by Comark and FBC.

Ms. Stigum, the most authoritative of the experts, testified that if a delivery of securities is not made, the customer who buys securities in a repo transaction has made "the equivalent of an unsecured loan." She did not say that a HIC repo "is" an unsecured loan, and on cross examination she admitted it was not. She noted that "the repo market has operated for years without a definition of what a repo is." However, FBC and its contact at Comark (Mr. Tisdale) intended the subject transactions be repos. They defined the term functionally. And that is about the best even Ms. Stigum could do.[22] Clearly, a repo is a hybrid transaction, made up of equal parts of security transaction and loan.

Another expert, Robert Pouyerow, a CPA working for the Trustee in this case, testified that accountants would not consider a HIC repo as a generator of gains or losses, for the securities are considered the assets of the one who *should have* delivered them to the other repo participant. That accounting practice was developed to prevent the "selling" party from "creating" gains or losses. However, the protective devices developed by accountants for their purposes do not serve to transform "repos" into "loans."

The awareness that repos can be used for chicanery, merely helps focus my inquiry on whether the transactions were truly "repos." If they were repos, they carried the indicia of both securities transactions and loans. In this instance, securities were actually transferred between Comark and FBC as part of the subject transactions. There were no sham or bogus transactions here. They were repos, not just loans; and the payment from Comark to FBC on June 9, 1982 was not just the repayment of a loan. It was the culmination of a transaction commonly transacted between stockbroker and customer in the money market of that day.[23]

From all before me, it is clear that in 1982, HIC repos were common if not wise.

customer or to a safekeeping account for the customer, was not a "true repo," but was merely an "unsecured loan."

However, even if I accept those arguments as valid (which I do not), the defense afforded by Section 547(c)(2) is no less valid (despite the further argument of the Trustee that the June 9, 1982 transaction was out of the "ordinary" because it was made to terminate FBC's relationship with Comark). Those arguments fail to recognize that the securities transactions all took on the mantle of the ordinary at the time they were agreed to (i.e., on June 1, and June 2, 1982); and the closing out of those transactions was made in the usual way. Motives play no part in the ordinariness equation in this case.

21. *See infra* note 10 at p. 811.

22. *See infra* note 4 at p. 809, for Ms. Stigum's definition of "repurchase agreement."

23. The Trustee contended that Comark was not a "stockbroker" and that FBC was not its "customer" (as that term is used in 11 U.S.C. §§ 741(2) and 101(48) [now § 101(50)]) in the context of the subject transactions.

The question of whether Comark was a "stockbroker" when it entered into the subject transactions was resolved at trial by a stipulation (or at least an admission by counsel for the Trustee) that it was. However, the evidence clearly established that fact as well.

The question of whether FBC was a "customer" of Comark during the subject transactions is actually a non sequitur or, perhaps more accurately, a non-issue; for Section 546(e) does not require that FBC be a "customer" of Comark to avail itself of the protections afforded by that section. Section 101(48) [now Section 101(50)] does define "stockbroker" as an entity "with respect to which there is a *customer,* as defined in section 741(2) of this title ...;" but that definition does not compel the result urged by the Trustee. Furthermore, FBC does fit the definition of "customer" set forth in Section 741(2).

It was also common then for repos to be agreed to on the telephone, without any written agreement and with written confirmations which the customer might not receive until days after the entire transaction had been consummated (just because in some instances, both ends of the repo were consummated faster than the postal service could deliver the confirmation of even the front end of the deal.) In other words, HIC repos were merely one way to keep funds flowing through the money market.[24] A more astute and careful person might have required delivery (at least to a safe-keeping account in its name) of each security in each repo transaction with Comark.[25] But FBC's failure to do so did not change the character of the transactions.

In addition, the evidence overwhelmingly favored the conclusion that FBC, through its Treasurer (Mr. Uhley), and Comark, through Mr. Tisdale, intended that the subject transactions be repos, not merely loans. In addition to the testimony of both Uhley and Tisdale as to their conversations about repos in general and, specifically the requisites of repos with FBC, both testified that it was the intent of both parties that the subject transactions be repos. That is borne out by Comark's documentation of those transactions.

My reasoning on that point was affected little by the Trustee's evidence aimed at casting Mr. Uhley in the role of the un-informed, uncaring guardian of FBC's funds. While I accept as proven, that Mr. Uhley was not always concerned about the specific security employed in a given repo transaction, and probably relied too heavily on oral representations of Comark's personnel, it was also proven that he knew the basics of a repo transaction and justifiably expected standard repo procedures would be followed in each instance.

Having determined that the subject transactions were repos, and thus securities transactions, I must still analyze the applicability and impact of 11 U.S.C. § 546, i.e., provisions which limit the avoidance powers of bankruptcy trustees as to certain stock, commodities and money market transactions.

■ Analysis and reason compel me to agree with the conclusions of both the Third Circuit Court in *Bevill, Bresler & Schulman v. Spencer Savings & Loan*, 878 F.2d 742 (3rd Cir.1989), and the Tenth Circuit in *Kaiser Steel Corp. v. Charles Schwab & Co., Inc.*, 913 F.2d 846 (10th Cir.1990), that Congress enacted § 546 "to minimize the displacement caused in the commodities and securities markets in the event of a major bankruptcy affecting those industries."; and that the term "settlement payment" was to be interpreted broadly to give effect to that congressional intent. (See *Kaiser Steel*, 913 F.2d at 849–50; and *Bevill, Bresler, etc.*, 878 F.2d at 751–2.)

In both of those cases, the courts dealt with the interpretation of 11 U.S.C. § 546(f). The Trustee would have me ignore Section 547(f) because it was not in effect when this case was commenced. FBC contends Section 547(f) is merely the "clarification" of congressional intent expressed when it enacted Section 546(e), July 27, 1982 (i.e., before commencement of the case); and that, in any case, Section 546(e) insulates FBC from the avoiding powers of the Trustee.

I note that 11 U.S.C. § 546(e), (which makes no specific reference to "repos," but is the first embodiment of the congressional intent noted above), was enacted July 27, 1982, in the same legislative package as

---

**24.** I refer the reader to the discussion of three basic means of carrying out repos, set forth in *Bevill, Bresler & Schulman v. Spencer Savings & Loan*, 878 F.2d 742, 746 (3rd Cir.1989). The testimony of the experts in this case did not differ materially from the conclusions drawn by that court.

**25.** The Third Circuit Court noted, "The Treasury Department has recognized that HIC repos rep-resent 'the greatest potential for loss on the part of investors since the securities purchased remain in the control of the seller [citation omitted].'" *Bevill, Bresler & Schulman v. Spencer Savings & Loan*, 878 F.2d at 746. However, that statement also evinces a recognition that HIC repos occupy a legitimate segment of the money market.

Sections 741(8).[26] This bankruptcy case was commenced September 1, 1982. Thus, at that time Section 546(e) was effective; and I find it applicable and dispositive. Therefore, I need not wrestle with the applicability of Section 546(f).[27]

Section 546(e) was enacted "to protect margin payments and *settlement payments* made by and to participants in the securities market generally." [Emphasis added.] *Bevill, Bresler,* 878 F.2d at 747. Prior to that time, Section 546 had applied to commodity brokers and markets but made no mention of securities markets or stockbrokers.

Ms. Stigums testified that the term "settlement payment" is not generally used in the money market. However, she went on to confirm that in each repo there are two settlement opportunities. One at the time the security is sold (i.e., on the "front end" of the repo), and the second at the time the security is repurchased (i.e., at the "back end"). If either the securities or the payment therefor are not "delivered" (by either physical delivery to the customer, delivery to the control of the customer's broker, or by "book entry" delivery) during each phase of the repo, a "fail" occurs entitling the non-defaulting party to specific legal rights (which are not material to this opinion). The terms "settlement" and "settlement payment" have been addressed extensively by the Third and Tenth Circuit Courts in the cases I have repeatedly relied upon in this opinion.

"Settlement is the completion of a securities transaction." *Kaiser Steel Corp.,* 913 F.2d at 849 (10th Cir.1990).[28] Two separate panels of judges of the Third Circuit have analyzed the expansiveness of the term "settlement payment" in the context of repo transactions and have concluded that it "may be the deposit of cash by the purchaser or the deposit or transfer of the securities by the dealer, and ... includes transfers which are normally part of the settlement process, whether they occur on the trade date, the scheduled settlement day, or any other date in the settlement process for the particular type of transaction." *Matter of Bevill, Bresler & Schulman Asset Management Corp.,* 896 F.2d at 59 (quoting from *Bevill, Bresler & Schulman v. Spencer Savings & Loan,* 878 F.2d at 752).

As noted earlier, by enacting Section 546(e), in 1982, Congress sought to protect the entire securities market. Comark was a "stockbroker" when the subject transactions with FBC were "settled" (i.e., by the payment on June 9, 1982), and when Section 546(e) was enacted. The subject transactions were "securities transactions," entitled to inclusion in its protective scheme initiated with that enactment. The fact that those securities transactions were "repos," dealt with more specifically in Section 546(f), does not obviate the application of Section 546(e). If anything, enactment of Section 546(f) reinforces the view that Section 546(e) is to be interpreted broadly; for

**26.** Section 741(8), defines "settlement payment," as that term is used in Sections 546(e) and (f). The term is defined there as "a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment, commonly used in the securities trade." [11 U.S.C. § 741(8)]

**27.** However, I note that each expansion of protection provided the securities and commodities markets by amendment to the Bankruptcy Code has ranged into new facets of those markets, rather than merely changing the wording of existing protective provisions. I note also that the Tenth Circuit, rejected (in dicta) the position that the addition of Section 546(e) in 1982 was merely clarification of existing law. [See *Kaiser Steel Corp. v. Charles Schwab & Co., Inc.,* 913

F.2d at 849, n. 5.] However, *see also Bevill, Bresler & Schulman v. Spencer Savings & Loan,* 878 F.2d at 747, wherein the Third Circuit Court notes that Section 546(e) "was the model upon which section 546(f) of the 1984 amendments was based."

**28.** Although in *Kaiser Steel,* the question was whether a bankruptcy trustee could recover, as preferential transfers, funds paid by a debtor immediately before its bankruptcy to complete a leveraged buyout of its own stock, the interpretation of the term "settlement payment" was directly at issue there. The appellate court gave the term "settlement" the meaning it is given in the marketplace, i.e., "the delivery and receipt of funds and securities," noting that it denotes the "finishing up" or "the completion" of a securities transaction.

**818**

Section 546(f) is further evidence that Congress has consistently expanded the purview of Section 546 to give effect to its protective purpose. I should not restrict its application unless the facts warrant it. Here they do not.

### CONCLUSION

In this case, both the plaintiff and the defendant have met their burdens of proof. The Trustee proved that the payment of monies by Comark to FBC was a preferential transfer. However, FBC proved its entitlement to the protections of affirmative defenses afforded by Sections 547(c)(1) and (2) and by Section 546(e). Therefore, the monies Comark paid to FBC on June 9, 1982 may not be recovered by the Trustee; and judgment will issue for the defense.