**In re COMARK, a California limited partnership, Debtor.**

**Sam JONAS, Chapter 7 Trustee, Appellant/Cross–Appellee,**

**v.**

**FARMER BROS. CO., Appellee/Cross– Appellant.**

**BAP Nos. CC–91–1280–PVMe, CC–91–1331–PVMe. Bankruptcy No. SA82–03850JB. Adv. No. SA85–1162JB.**

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted on Feb. 19, 1992.

Decided Sept. 23, 1992.

Stephan M. Ray, Los Angeles, Cal., for appellant.

Robin C. Campbell, Los Angeles, Cal., for appellee.

Before PERRIS, VOLINN, and MEYERS, Bankruptcy Judges.

## OPINION

PERRIS, Bankruptcy Judge:

These appeals arise from the bankruptcy court's judgment determining that a prepetition transfer pursuant to a repurchase agreement from the debtor, Comark, to the appellee, Farmer Bros. Co. ("FBC") could not be avoided by the debtor's Chapter 7 Trustee, Sam Jonas ("the Trustee"). The bankruptcy court determined that although the Trustee established the elements of 11 U.S.C. § 547(b),[1] the transfer was protected by the defenses of sections 547(c)(1), 547(c)(2) and 546(e). In CC–91–1280, the

Trustee appeals the bankruptcy court's judgment in favor of FBC. In CC–91–1331, FBC cross-appeals the bankruptcy court's determination that the Trustee established the elements of section 547(b).[2] For the reasons set forth below, we AFFIRM the bankruptcy court's judgment in favor of FBC.

## FACTS

Comark was a dealer in securities. A substantial portion of Comark's business involved Repurchase Agreements ("repos"). A typical repo is a transaction involving a sale and simultaneous agreement to repurchase an asset, most often government securities.[3] In a typical repo, simultaneous with the sale of a security, the seller agrees to buy back the security at a designated future date ("the maturity date") for the original purchase price plus interest at a predetermined rate accruing from the original trade date to the maturity date.[4] A reverse repo is a standard repo transaction in which the repo market dealer or trader purchases the security for its own account with an agreement to resell it to the seller. Thus, when one sells a security and agrees to buy it back, he is engaged in a repo. When the same party buys a security and agrees to sell it back, he is engaged in a reverse repo. Repos and reverse repos involve large amounts of money, are typically of limited duration and are usually closed by an oral agreement subject to written confirmation. Repos and reverse repos are a huge and significant part of the nation's financial system.[5]

---

1. All section references are to the Bankruptcy Code, 11 U.S.C. § 101, *et seq.*, unless the context otherwise indicates.

2. Because, as discussed below, we determine that the bankruptcy court did not commit reversible error in determining that avoidance of the payment was precluded by sections 546(e), 547(c)(1) and 547(c)(2), we need not and do not address the issues raised in FBC's cross-appeal concerning whether the Trustee established the elements of section 547(b).

3. Most repos involve government or government agency securities. However, bank certificates of deposit, bankers' acceptances and short term notes and commercial paper of major corporations may be the subject of repos as well.

4. The interest paid at the maturity date of the repo does not bear any relation to the interest rate or yield of the underlying security, but rather is based on the prevailing market rate paid on investments or financing transactions of similar maturity and risk.

5. For greater discussion of the magnitude and impact of repo transactions *see In re Bevill, Bresler & Schulman Asset Management Corp.*, 67 B.R. 557, 566–71 (D.N.J.1986), and *Bevill, Bresler & Schulman Asset Management Corp. v. Spencer Sav. & Loan Assoc.*, 878 F.2d 742, 745–46 (3d Cir.1989).

Typically, Comark would purchase a security through a reverse repo. The security would be transferred, either physically or through a book entry at the Federal Reserve Bank, to Comark's clearing account at Marine Midland Bank ("Marine"). Comark would then sell the security in a repo to a customer. The repo agreement would be reached over the telephone with a written confirmation being sent in a matter of days. Comark would often hold the security subject to the repo for the customer until it repurchased the security pursuant to its obligation under the repo.[6] Upon the agreed maturity date, Comark would repurchase the security from its customer, paying the original purchase price plus the predetermined interest rate. At the designated time, Comark would then complete the final leg of the reverse repo by reselling the security to the party from whom it was originally purchased.

Comark conducted its trades through its clearing account with Marine. Marine would receive and hold in the clearing account, subject to Comark's instructions, securities purchased by Comark. Marine would also, upon Comark's instructions, effectuate trades of Comark's securities through the clearing account.[7] As part of the clearing process, Marine extended to Comark a line of credit that often exceeded $20,000,000. This credit was secured by a floating security interest and lien upon the contents of the clearing account. Comark did not have a safekeeping account whereby securities belonging to Comark's customers were segregated from Comark's securities in the clearing account.

FBC is a producer and distributor of coffee and coffee related products. The nature of this business required FBC to have large amounts of cash readily available to make purchases. FBC began investing in repos in 1980 as a means of obtaining a favorable return on the short term investment of its large cash reserves. From July of 1981 through early June of 1982, FBC entered into repo transactions with Comark. David Uhley, FBC's representative, and Richard Tisdale, Comark's account executive, understood that the repo transactions would involve government securities and that Comark would hold the securities purchased by FBC in safekeeping.[8] The repo transaction would be entered into over the telephone, followed up by written confirmation slips, setting forth the terms of the transaction and identifying the specific securities that were purchased. Most of these repos were "open" repos, which would continue from day to day subject to termination by either party at any time. FBC would contact Comark on a daily basis regarding the open repos and decide whether to continue the repos, invest money in new repos or terminate the repos.

The transactions at issue in this appeal involve three non-delivery repos entered into in early June of 1982.[9] On June 1, 1982, Comark sold FBC a $2,000,000 certificate of deposit issued by Industrial Bank of Japan ("IBJ") for that amount and a

---

**6.** Generally, there are two types of custodial arrangements involved in the typical repo. The first is a delivery repo in which the dealer transfers possession of the security to the purchaser or the purchaser's designated custodial bank at the outset. The second is a non-delivery or hold-in-custody ("HIC") repo in which the dealer retains the securities for the account of the purchaser by placing the securities in a segregated safe-keeping account or otherwise holding the securities for the purchaser's benefit.

**7.** If the transfers involved physical securities, they were accomplished by the delivery of the securities to Comark's trading partner or to its custodial bank. The majority of the trades, however, were accomplished through electronic "book entry" procedures.

**8.** Although Comark represented that the securities would be placed into a safekeeping account, Comark did not have such an account. Instead the securities at issue remained in Comark's clearing account with FBC's interest being noted on Comark's internal documents and on the confirmation slips sent to FBC.

**9.** As will be discussed more fully below, the Trustee disputes that these transactions were repos and that these transactions involved the purchase and sale of securities. Rather, the Trustee contends that these transactions were, in substance and reality, unsecured loans. For ease of reference, we will refer to the transactions as repos and use corresponding terms of purchase and sale.

$2,000,000 FNMA bond for $1,960,000 as part of two separate open repos. Comark agreed to repurchase these securities for the $3,960,000 paid by FBC plus interest at 12.5% per annum. On June 3, 1982, Comark sold FBC a $1,000,000 U.S. Treasury Note for $990,000 under an open repo, agreeing to repurchase the note for that amount plus approximately 13% interest. After the sales, Comark retained the securities in its clearing account.

On June 4, 1982, Marine foreclosed upon approximately $27,500,000 in securities in Comark's clearing account. The foreclosed securities did not include the securities that were subject to the repos with FBC. After David Uhley read a newspaper article discussing Comark's financial problems, FBC terminated the repos at issue on June 9, 1982. Pursuant to the terms of the repos, Comark repurchased the three securities with wire transfer payment of $4,963,-851.29.

On September 1, 1982, an involuntary bankruptcy was filed against Comark. Subsequently, the Trustee filed an adversary proceeding seeking to avoid the payment as a preferential transfer under section 547(b). Following trial, the bankruptcy court issued its Memorandum Opinion, *see In re Comark*, 124 B.R. 806 (Bankr. C.D.Cal.1991), determining that the payment was protected from avoidance under sections 546(e), 547(c)(1) and 547(c)(2). The Trustee filed this timely appeal from the judgment in favor of FBC. FBC cross-appeals the bankruptcy court's determination that the Trustee has established the elements of a preferential transfer under section 547(b).

## ISSUES

The issues raised in these appeals concern whether the bankruptcy court committed reversible error in determining the following:

1. That the transfer is protected from avoidance under section 546(e);

2. That the transfer is protected from avoidance under section 547(c)(1); and

3. That the transfer is protected from avoidance under section 547(c)(2).

## STANDARD OF REVIEW

■ We review conclusions of law *de novo* and findings of fact for clear error. *E.g., In re Pizza of Hawaii, Inc.*, 761 F.2d 1374, 1377 (9th Cir.1985). Issues of statutory construction and determining the applicable legal standards for establishing elements of the pertinent affirmative defenses involve questions of law. Whether FBC has submitted sufficient proof to establish its affirmative defenses involve factual questions.

## DISCUSSION

1. Section 546(e).

Section 546(e) precludes avoidance of a transfer that is a settlement payment made prior to the commencement of the bankruptcy case by or to a stockbroker.[10] The parties do not dispute that Comark was a stockbroker. The Trustee, however, challenges the bankruptcy court's determination that the payment at issue was a settlement payment, contending that the bankruptcy court construed the term "settlement payment" under section 546(e) too broadly to include payments made under repo transactions and that, in any event, this transaction did not involve, as the bankruptcy court determined, a true repo agreement and a true payment in completion of a securities transaction.

**10.** Section 546(e) provides, in pertinent part, that "the trustee may not avoid a transfer that is a ... settlement payment, as defined in section 741(8) of this title, made by or to a ... stockbroker ..., that is made before the commencement of the case, except under section 548(a)(1) of this title." Section 741(8) defines settlement payment to mean "a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade."

Section 546(e) was enacted originally as § 546(d) in 1982 by Public Law No. 97–222. In 1984, this provision was redesignated as section 546(e). The present version of section 546(e) remains substantially identical to the originally enacted version.

## A. *The scope of section 546(e).*

The bankruptcy court determined that because the repos were securities transactions, the payments at issue were settlement payments under section 546(e). 124 B.R. at 815–817. In reaching this conclusion, the bankruptcy court determined that the term "settlement payment" should be interpreted broadly to include a payment in completion of any securities transaction, including repos. 124 B.R. at 817.

The bankruptcy court's interpretation of the term "settlement payment" is consistent with recent Ninth Circuit authority. In *In re Comark*, 971 F.2d 322 (9th Cir. 1992), the Ninth Circuit followed other circuits which have adopted a broad interpretation of the term "settlement payment" and determined that, under section 546(e), the term includes a transfer of securities that completes any securities transaction, including repo transactions. Such a broad interpretation is consistent with the legislative history of section 546(e), which indicates that Congress enacted this provision to alleviate concerns about the volatile nature of the commodities and securities markets and to prevent "the insolvency of one commodity or security firm from spreading to other firms and possibly threatening the collapse of the affected market." H.Rep. No. 97–420, 97th Cong.2d Sess. 1 (1982); U.S.Code Cong. & Admin.News 1982, 583; *Bevill, Bresler & Schulman Asset Management Corp. v. Spencer Sav. & Loan Assoc.*, 878 F.2d 742, 747 (3d Cir.1989) ("*Bevill II*"). This broad interpretation is further supported by the all-inclusive defini-

tion of "settlement payment" in section 741(8). We, therefore, agree with the bankruptcy court that by virtue of this broad interpretation of the term "settlement payment", the term encompasses a payment in completion of any securities transaction, including repos.

The enactment of section 546(f) after the commencement of Comark's bankruptcy case does not alter our conclusion.[11] Section 546(f) provides, in pertinent part, that "the trustee may not avoid a transfer that is a ... settlement payment ... made by or to a repo participant in connection with a repurchase agreement...." The Trustee contends that by reading section 546(e) to include payments made in completion of repo transactions we would either render section 546(f) unnecessary or give it retroactive effect when Congress did not so provide. We disagree. Although statutory amendments are not generally given retroactive effect unless Congress so provides, it is a well established principle that courts may consider a subsequent amendment as reflective of the intent of the earlier statute if the amendment is intended as a clarification rather than a change of the earlier law. *See, e.g., Red Lion Broadcasting Co. v. F.C.C.*, 395 U.S. 367, 380–81, 89 S.Ct. 1794, 1801–02, 23 L.Ed.2d 371 (1969); *In re Adams*, 761 F.2d 1422 (9th Cir.1985). On balance, the legislative history of section 546(f) was intended to clarify rather than change earlier law.[12] Thus, if it has any effect, the enactment of section 546(f) and its legislative history provides a fur-

---

11. Section 546(f) was added to the Bankruptcy Code in 1984 by the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353, 98 Stat. 333 (1984). These amendments also added the definitions of a "repo participant" and a "repurchase agreement" that are set forth in 11 U.S.C. §§ 101(46) and 101(47). The 1984 amendments to the Code apply to cases filed 90 days after the date of enactment of the amendments. Pub.L. No. 98–353. Section 553(a). Because Comark's bankruptcy case was filed prior to 1984, these statutory provisions are not *per se* applicable to this case.

12. Statements referring to the "uncertainty" of existing law, *see* S.Rep. No. 65, 98th Cong., 1st Sess. 45, 47 (1983) ("1983 Senate Report"), suggest that Congress enacted section 546(f) and

related provisions in order to clarify ambiguous law. This is further supported by statements made in support of the amendments which clearly indicate that the amendments were intended to clarify the status of repurchase agreements in bankruptcy. 130 Cong. Rec. H7494 (daily ed. June 29, 1984) (statement of Rep. Glickman), *reprinted in* Lawrence P. King, *Collier on Bankruptcy*, Appendix 4, XX at 25 (1992). While there is language in the legislative history which could be construed as suggesting that the enactment of the section 546(f) was intended to change prior law, *see* 1983 Senate Report at 47, we find that any indications that the amendments were intended to change prior law are outweighed by the stronger indications that Congress intended to clarify the existing law.

ther indication that section 546(e) was intended to apply to payments made in repo transactions.

### B. *The transaction as a loan or a securities transaction.*

■ Having determined that section 546(e) applied at the time in question to settlement payments made in all securities transactions, including repos, the next question is whether the transactions in this case were securities transactions. The Trustee disputes that the transactions at issue are securities transactions under section 546(e). The Trustee contends that repos are loans rather than securities transactions and that even if some repos may be securities transactions, the transactions in this case cannot be because they are not bona fide repos.

■ In *In re Bevill, Bresler & Schulman Asset Management Corp.*, 67 B.R. 557 (D.N.J.1986) (*"Bevill I"*), the court held that whether a particular repo transaction will be characterized as a securities transaction or as a loan will be determined by the objective intent of the parties. 67 B.R. at 586–87. The court reasoned that the objective intent of the repo participants in that case to engage in a purchase and sale transaction was reflected by the terms of the transaction as well as extrinsic evidence of intent, such as the books and records of the parties, accounting practices, regulatory treatment of the transactions and trade custom and usage. *See generally*, 67 B.R. at 587–98. The court indicated that certain terms that are normally found in credit transactions did not convert the repo into a loan transaction. 67 B.R. at 587–90. These terms include the payment of interest at a rate unrelated to the interest rate of the underlying security, the fact that the repo buyer must return the same underlying security upon maturity of the repo and the seller's right of substitution. *Id.* The court also indicated that the fact

that tax cases treat repos as loans is not compelling given that the economic substance of the transaction, rather than the objective intent of the parties, was the central consideration in those cases. 67 B.R. at 594.

Turning to this case, contrary to the Trustee's contentions, the bankruptcy court did not commit clear error in finding the transactions at issue to be bona fide repos and therefore securities transactions rather than loans. Although the Trustee's expert testified that HIC repos were the equivalent of unsecured loans in terms of credit risk, she did not testify that the repos at issue were loans. While Uhley may not have had a complete understanding of repo transactions in general and the exact nature of the transactions with Comark,[13] the testimony of Uhley and Tisdale, as well as Comark's documentation of these transactions, reflects that the parties intended the transactions to be repos involving the sale and repurchase of securities.

The fact that the transactions at issue were HIC repos[14] under which FBC did not take possession of these securities did not mean that the transactions were not bona fide repos or sales of securities. Although HIC repos may have increased the risk to the repo participant, the evidence reflects that at the time of these transactions, HIC repos were common in the industry. This fact is further reflected by the discussion in *Bevill II*, 878 F.2d at 746. In addition, that the securities were delivered to FBC under applicable Uniform Commercial Code provisions, as discussed below, reflects that FBC did not need to take possession in order to purchase the securities in the first leg of the repos and that the lack of a safekeeping account did not render these transactions sham sales.

In light of the above evidence, the bankruptcy court did not commit clear error in determining that the transactions at issue were bona fide repos and therefore securi-

---

13. The evidence reflects that Uhley relied on Comark's representations that the repos would be in government securities and that the securities would be placed in safekeeping when, in fact, the nature of the transactions were not always consistent with the representations.

14. As discussed above in footnote 6, an HIC repo is one in which the dealer retains the securities for the account of the purchaser by placing the securities in a segregated safekeeping account or otherwise holding the securities for the purchaser's benefit.

ties transactions. It follows that the bankruptcy court did not commit reversible error in determining that section 546(e) precluded avoidance of the payments at issue.

2. Section 547(c)(1).

■ As an alternative basis for affirming the bankruptcy court, we determine that the bankruptcy court did not commit clear error in determining that the transfer is protected from avoidance under section 547(c)(1). This section prevents the avoidance of a transfer to the extent that the transfer was intended by the debtor and the transferee to be a contemporaneous exchange for new value and was, in fact, a contemporaneous exchange. Section 547(a)(2) defines "new value" as follows:

> money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable under applicable law. . . .

FBC contends that the transfer is protected by section 547(c)(1) because, pursuant to the repurchase agreement, it retransferred ownership of the securities to Comark contemporaneous with the payment by Comark. FBC contends that ownership of the securities was transferred to it upon the initiation of the repos under Uniform Commercial Code § 8–313(1)(d). The Trustee contends that the transfer of June 9 was not an exchange of new value because FBC never obtained an ownership interest in the securities upon the initiation of the repos that it could retransfer to Comark.

■ The parties do not dispute that the pertinent requirements for establishing the requisite transfer or delivery of the securities are that: (1) the broker/financial intermediary must send confirmation of the purchase; (2) the broker/financial intermediary must, by book entry or otherwise, identify a specific security as belonging to the purchaser; and (3) the security must be in the broker/financial intermediary's possession. *See In re Bevill I,* 67 B.R. at 566–71; Uniform Commercial Code § 8–313(1)(d). The Trustee does not dispute that Comark

identified the specific securities that were subject to the repo transaction as belonging to FBC. The Trustee contends, however, that there is insufficient evidence to support the bankruptcy court's findings that Comark sent confirmation of the purchase to FBC and that Comark had possession of the securities.

A. *Confirmation of the Purchase.*

As with all elements of the section 547(c) defenses to preference actions, FBC bears the burden of establishing that Comark sent confirmations of the purchases. *See* § 547(g). FBC met this burden by submitting the written confirmations prepared by Comark for the sales initiating each of the three repo transactions at issue in this appeal. *See* Exhibits 11, 24 and 27, E.R. at 2067, 2080 and 2083. FBC also submitted evidence that Comark's standard practice was to send written confirmation to its customers on every repo transaction. E.R. at 1395–99. There is also evidence that FBC never received the written confirmations of transactions occurring after May 31, 1982. However, in the absence of specific evidence that the confirmations at issue were not sent, the production of the written confirmations and the evidence that Comark sent confirmations as a standard practice are sufficient to uphold the bankruptcy court's finding that FBC met its burden of establishing that Comark sent confirmations of the purchases at issue.

B. *Comark's possession.*

■ It is undisputed that the securities were in Comark's clearing account with Marine at all times and that Comark, therefore, did not have actual physical possession. Actual physical possession by the dealer, however, is unnecessary. Rather, a dealer has sufficient constructive or effective possession when the dealer's clearing agent holds the securities on behalf of the dealer subject to its directions. *Bevill I,* 67 B.R. at 609–612; *Wichita Federal Savings & Loan Ass'n. v. Comark,* 610 F.Supp. 406, 414–16, 40 U.C.C.R. 612, 624–26 (S.D.N.Y.1985); *Matthysse v. Securities Processing Services, Inc.,* 444 F.Supp. 1009, 1018 (S.D.N.Y.1977).

Whether a dealer has constructive or effective possession of securities held by its clearing agent will depend upon with whom the contractual relationship between the dealer and its agent places dominion or control over the securities. *Id.* In *Bevill I*, the court determined that the clearing agent had the ultimate dominion or control and the broker, therefore, did not have possession of the securities in its clearing account. In reaching this decision, the court relied upon the clearing agreement between the parties which placed a lien upon the securities in the clearing account as security for clearing loans to the broker and which granted the clearing agent the unilateral right and total discretion to disregard the dealer's instructions regarding the movement of securities out of the account. 67 B.R. at 610. In *Wichita Federal Savings,* the court examined the issue of Comark's constructive possession of securities in the context of the same General Loan and Security Agreement between Comark and Marine that is at issue in this appeal and determined that Comark retained constructive or effective possession of the securities held in the Marine clearing account. 610 F.Supp. at 414–16, 40 U.C.C.R. at 624–626.[15]

In this case, the only agreement in the record between Comark and Marine pertaining to the clearing account is a General Loan and Security Agreement which grants Marine a security interest and lien upon the property of Comark in the clearing account and which provided Marine with powers to apply in its discretion any of the collateral to the obligations owed the bank. Marine's lien rights provided it with a certain measure of control over the securities in the clearing account, including, arguably, the right to foreclose upon securities in the account.[16] In addition, as the Trustee points out, there are policy reasons militating against a determination that a dealer has constructive possession of securities held in an encumbered account. *See Bevill I,* 67 B.R. at 611–12. However, Marine's control over the securities in the account was not unlimited and Comark retained certain rights with respect to the securities. Notwithstanding Marine's lien rights in the securities, Comark had the right to sell and otherwise deal in the securities in the account, as is illustrated by the evidence indicating that Comark regularly did so. In addition, as the bankruptcy court noted, Marine did not have the right, as did the clearing agent in *Bevill I,* to unilaterally ignore Comark's instructions to transfer securities into or out of the clearing account. Unlike the relationship in *Bevill I,* the only way that Marine could limit Comark's control was to foreclose on the securities in the account and it did not do so with respect to the securities that are the subject of the repos at issue.

This distinction between the control exercised by the clearing agent in *Bevill I* and the control exercised by Marine in this case is crucial. On the strength of this distinction and on the authority of *Wichita Federal Savings, supra,* we uphold the bankruptcy court's finding that Comark had effective or constructive possession of the securities. It follows that FBC established that the securities at issue were transferred to it in connection with the initiation of the repos at issue and that by retransferring ownership of the securities contemporaneously with the payment on June 9, FBC and Comark engaged in a contemporaneous exchange for new value under section 547(c)(1).[17]

---

**15.** *Wichita Federal Savings* did not specifically deal with the arguments raised by the Trustee in reliance upon *Bevill I.* The court did, however, indicate that constructive or effective possession turns upon dominion or control over the securities as determined by the contractual relationship and that under the contractual relationship at issue, Comark retained constructive possession of the securities. *Bevill I* does not compel a different result because, as we discuss below, the relationship in this case is distinguishable from the relationship in that case.

**16.** Although the terms of the General Loan and Security Agreement indicate that Marine had the right to foreclose, this right to foreclose on securities that were subject repos was disputed in *Wichita Federal Savings.*

**17.** The trustee's other arguments as to why the payment is not protected from avoidance under section 547(c)(1) are unpersuasive. The Trustee's arguments that the parties did not intend this transaction to be substantially contemporaneous and that the transaction was not, in fact,

3. Section 547(c)(2).

 A further alternative basis for affirming the bankruptcy court's judgment is provided by section 547(c)(2), which provides, in pertinent part, that a trustee cannot avoid a transfer under section 547 to the extent the transfer was made according to ordinary business terms and in the ordinary course of business or financial affairs of the debtor and the transferee.[18] This section is intended to protect ordinary and customary trade credit transactions and leave normal financial relations undisturbed. *In re Pioneer Technology, Inc.,* 107 B.R. 698, 701–02 (9th Cir.BAP 1988). Courts determining whether a transfer is within the ordinary course of business look to the prior course of business of the parties. *In re Powerine Oil Co.,* 126 B.R. 790, 795 (9th Cir.BAP 1991). Whether a transfer is made according to ordinary business terms is determined by an objective standard based on practices common to businesses similarly situated to the debtor and the transferee. *In re Loretto Winery, Ltd.,* 107 B.R. 707, 709 (9th Cir.BAP 1989). Under these standards, payments arising out of unusual debt collection or payment practices are not protected. *Powerine Oil,* 126 B.R. at 795; *Pioneer Technology,* 107 B.R. at 702; *In re Craig Oil Co.,* 785 F.2d 1563, 1566 (11th Cir.1986).

 The evidence supports the bankruptcy court's determination that the payment at issue was made according to ordinary business terms and in the ordinary course of business of Comark and FBC. The evidence reflects that the payment was consistent with the standard practices of the repo trading business, in which repos are typically closed a few days after initiation and the securities are retransferred to the original seller against the payment of funds. The evidence also reflects that the payment was consistent with the prior course of business between Comark and FBC. The history of the relationship between the parties reflects irregular investments by FBC in repos followed by the resale of the securities to Comark a few days later, which would, at times, leave FBC having no investment with Comark. There is no evidence that FBC used any economic pressure or engaged in any unusual debt collection practices to force the payment.

Comark was experiencing financial difficulties at the time of the payment and FBC requested repayment after it heard of these financial difficulties. This does not, however, compel a conclusion that the payment was not in the ordinary course of business. This is not a situation akin to the bank run addressed in *In re Southern Industrial Banking Corp.,* 92 B.R. 297 (Bankr.E.D.Tenn.1988), because there is no indication that Comark experienced the level of commotion that was present in that case where the debtor was reluctant to pay and did so only in response to demands and unusual collection methods by the investors. Rather, the evidence in this case reflects conduct consistent with the prior dealing between the parties and industry practice that occurred during the debtor's downward slide into bankruptcy. On the basis of this evidence, the bankruptcy court did not commit clear error in determining the payments were made in the ordinary course of business.

## CONCLUSION

For the reasons set forth above, the bankruptcy court correctly construed the

---

substantially contemporaneous is without merit because those arguments look to whether the payment of June 9 was contemporaneous with the June 1 and June 3 transactions rather than addressing the proper inquiry—whether the payment of June 9 was contemporaneous with a retransfer of securities from FBC to Comark. The trustee's arguments that new value has not been exchanged because the payment was in satisfaction of an antecedent debt are similarly without merit. Although the satisfaction of an antecedent debt will not, by itself, amount to new value for purposes of section 547(c)(1), the debtor may, as in this case, receive value in addition to the satisfaction of the debt.

**18.** At the time Comark's bankruptcy petition was filed, section 547(c)(2) required protected transfers to also be in payment of a debt incurred in the ordinary course of business or financial affairs of the debtor and the transferee and made not later than 45 days after such debt was incurred. The parties do not dispute that the payments at issue satisfied these two elements of section 547(c)(2).

pertinent affirmative defenses to the Trustee's avoidance action and the record supports the bankruptcy court's determination that avoidance of the payments is prevented by sections 546(e), 547(c)(1) and 547(c)(2). We therefore AFFIRM the bankruptcy court's judgment.