In re THRIFTY OIL COMPANY, a California corporation; Golden West Refining Company, a California corporation; CLUJ Distribution Company, a California corporation; and Golden West Distribution Company, a California Corporation, Debtors.

Bankruptcy Nos. 92–09132–A11 to 92–09136–A11.

United States Bankruptcy Court, S.D. California.

Aug. 5, 1997.

Robert A. Greenfield, Isaac M. Pachulski, Stutman, Treister & Glatt, Los Angles, CA, for Debtors.

Tiffany L. Carroll, Office of U.S. Trustee, Southern Dist. of CA, San Diego, CA, United States Trustee.

Joel Ohlgren, Sheppard, Mullin, Richter & Hampton, Los Angeles, CA, for the OCC.

Victor Vilaplana, Sheppard, Mullin, Richter & Hampton, San Diego, CA, for the OCC.

Patrick C. Shea, David E. Kleinfeld, Matthew S. Walker, Pillsbury Madison & Sutro, LLP, San Diego, CA, for Bank of America.

Leonard L. Gumport, Gumport, Rietman & Montgomery, Los Angeles, CA, for Debtor.

## MEMORANDUM DECISION

LOUISE DeCARL ADLER, Chief Judge.*

Bank of America National Trust and Savings Association ("BofA") filed claim No. 650B, which arises from revested debtor's ("Thrifty") guaranty of Golden West Refining Company's ("GWR") obligation to the bank. Thrifty objected to BofA's claim and because of the apparent need for further discovery and an evidentiary hearing, the matter was deemed a contested matter under Fed. R.Bankr.P. 9014.[1] After conducting discovery, BofA and Thrifty brought these cross motions for summary judgment. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B).

A motion for summary judgment may be granted if, upon consideration of the pleadings, depositions and declarations, the court

---

* Formerly known as Louise DeCarl Malugen.

1. Rule 9014 provides that certain Adversary Rules (Fed. R. Bankr.P. 7000–7087) apply to contested matters.

is persuaded that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. Although Thrifty's opposition states that there are many "disputed issues of fact," upon a closer examination, many of the claimed factual disputes are really legal questions. Also, the Court finds many of the alleged "disputed" facts are nonmaterial. Materiality of disputed facts is examined when determining whether summary judgment is appropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). In addition, the court must draw all inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

The following factual summary sets out each undisputed fact which the Court believes is material to the decision of this motion for summary judgment.

## I.  FACTUAL SUMMARY

In August 1989, GWR solicited a $75 million term loan ("Term Loan") from BofA and other potential lenders, in part to refinance a $52.1 million promissory note payable to Chevron (which note bore an 11% fixed rate), and in part to finance capital improvements. BofA submitted a loan proposal to GWR on September 29, 1989. (Exh. 1) Negotiations ensued and a final term sheet for the loan dated January 10, 1990 was executed by GWR on January 12, 1990. (Exh. 13). The term sheet provided for a variable interest rate Term Loan (called "Facility B") and also provided that the Term Loan would be fully underwritten by BofA. The term sheet also stated that GWR would enter into an interest rate swap ("Swaps") with BofA to hedge the Term Loan's interest rate fluctuations. (Exh. 13, Bates No. 51). The Term Loan for $45 million closed on or about July 31, 1990. The syndication of the Term Loan closed on December 20, 1990. After syndication was completed, BofA was a lender on less than one-half the principal balance of the Term

Loan. GWR borrowed an additional $7 million under the Term Loan on November 6, 1991.

Thrifty executed an unsecured guaranty dated as of July 30, 1990 in which it guaranteed "all obligations of Borrower [GWR] under the Loan Documents [which was defined in the Term Loan Agreement to include both the Term Loan Agreement and Approved Swap Agreements]." (Exh. 39, Bates No. 458).

GWR entered into its first interest rate swap with BofA on June 20, 1990 with a notional amount of $21.5 million and a delayed start date of August 1, 1990. GWR entered into a second swap with BofA on July 12, 1990 with the notional amount of $10.75 million with a delayed start date of August 1, 1990. On August 1, 1990, GWR entered into a third swap with BofA with a notional amount of $12.75 million which had a start date of August 3, 1990. The Term Loan and the Swaps were cross-collateralized and cross-defaulted. BofA sent out confirmations of the three swaps which included statements that they would be governed by the standard form recommended by the International Swap Dealers Association, Inc. ("ISDA") which was later signed by both parties (collectively "Swap Agreement"). Under the Swap Agreement, GWR made payments based on fixed interest rates multiplied by the notional amounts and BofA made payments based on three month LIBOR[2] multiplied by the notional amounts. BofA's swap operations department sent GWR the payment notices pertaining to the Swaps. (Exh. 70–77). GWR's bankruptcy filing on July 31, 1992 constituted an early termination event of the Swap Agreement under the ISDA Agreement (Exh. 79, Bates No. 586) giving rise to termination damages of $5,428,500 as calculated according to the ISDA Agreement.

On September 28, 1994, Thrifty, GWR and their affiliates filed the "Joint Plan of Reorganization (As Modified) (September 28, 1994)" (The "Plan"). In connection with the Plan, the Court approved a Bank Group Settlement Agreement among BofA, GWR,

---

**2.** "LIBOR" means "London Interbank Offered Rate" and refers to the interest banks have to pay

other banks in order to borrow money in the London money market.

Thrifty and others which fixed BofA's termination damage claim at $5,428,500. BofA filed a claim for $5,428,500 to which Thrifty has objected. Thrifty contends that the claim should be disallowed either as prohibited by section 502(b)(2) as unmatured interest or as violating California's Bucket Shop laws.[3]

## II. ISSUES

A. Are "termination damages" under the Swap Agreement unmatured interest prohibited by 11 U.S.C. section 502(b)(2)?

B. Do the Swaps violate the California Bucket Shop Laws?

## III. DISCUSSION

■ To better understand this Court's decision, a discussion of a swap is relevant. A swap is considered a derivative which is a "bilateral contract or payments exchange agreement whose value derives . . . from the value of an underlying asset or underlying reference rate or index." *Procter & Gamble Co. v. Bankers Trust Co.*, 925 F.Supp. 1270, 1275 (S.D.Ohio 1996). In essence, it is an agreement to exchange cash flows over a period of time. *See, Procter & Gamble Co.*, 925 F.Supp. at 1275; Martin J. Bienenstock & Paul M. Basta, *Treatment of Derivatives under the Bankruptcy Code*, P.L.I. No. N4–4585 (1994). The cash flows are calculated by multiplying the respective interest rates by a notional amount. *Procter & Gamble Co.*, 925 F.Supp. at 1275. The notional amount is an agreed principal amount against which the accruing interest obligations between the parties are calculated. S. Tucker, *Interest Rate Swaps and the 1990 Amendments to the United States Bankruptcy Code: A Measure of Certainty Within the Swap Market Contracts*, 1991 Utah L.Rev. 581, 586 n. 32. Usually it is a hypothetical amount that is never actually paid or received. *Id.*

GWR and BofA entered into three Swaps having a total notional amount of $45 million. GWR agreed to pay a fixed rate of interest to BofA while BofA agreed to pay a floating rate of interest to GWR. The "net amount" is

what actually changed hands. In this case, because the interest rates declined during the Swaps period, GWR made periodic payments to BofA. (Exh. 70–75).

## A. Termination Damages as Unmatured Interest

■ Thrifty argues that BofA's termination damages claim represents unmatured interest prohibited by section 11 U.S.C. 502(b)(2). The general rule disallowing unmatured interest is a rule of administrative convenience and fairness to all creditors and is not an absolute rule. *See, In re Hanna*, 872 F.2d 829, 830 (8th Cir.1989). The rule makes it possible to calculate the amount of claims with certainty. *See, In re Quick*, 152 B.R. 902, 906 (Bankr.W.D.Va.1992). *Id.* Further, it assures that creditors at the bottom rungs of the priority ladder are not prejudiced by delay in payment to higher priority creditors.

Thrifty contends the termination damages claim is the result of an integrated transaction that includes both the Term Loan Agreement and the Swap Agreement and which essentially created a fixed rate loan. BofA argues that the Term Loan Agreement and the Swap Agreement are separate transactions and the obligations arising from premature termination of the Swap Agreement arise only because of the breach of the terms of the Swap Agreement and not because BofA intended to disguise unmatured interest.

■ Interest is money "paid to compensate for the delay and risk involved in the ultimate repayment of monies loaned." *In re Pengo Industries, Inc.*, 962 F.2d 543, 546 (5th Cir.1992). The money loaned in this case is the amount loaned under the Term Loan Agreement. To characterize the termination damages as interest, the Court must conclude that it was the parties' intent that the Swap payments compensate BofA for delay and risk in the repayment of the Term Loan. To reach this conclusion the Court must examine GWR and BofA's intent in entering into the Term Loan and Swaps.

---

**3.** Cal. Corp.Code §§ 29000–29201 (West 1997).

Thrifty contends there is a substantial factual dispute as to the intent of the parties. Both BofA and Thrifty cite *In re Comark*, 145 B.R. 47 (9th Cir. BAP 1992) to support their respective positions regarding intent. *Comark* involved a pre-petition transfer pursuant to a repurchase agreement from the debtor to another entity. The court had to determine whether the transaction was a loan or a security transaction in order to apply section 546(e). *Id.* at 49. The court explained that to characterize the transaction, it must look at the parties' objective intent. *Id.* The *Comark* court concurred with the court in *In re Bevill*, 67 B.R. 557 (D.N.J.1986) and held objective intent is "reflected by the terms of the transaction as well as extrinsic evidence of intent, such as the books and records of the parties, accounting practices, regulatory treatment of the transaction and trade custom and usage." *Id.* at 53. The Court will apply *Comark's* definition of objective intent to determine whether the two transactions should be recharacterized as one.

### 1. Terms of Transaction

Thrifty directs the Court to examine the Loan Proposal, the Term Sheet, and the Term Loan Agreement. BofA wants the Court to look only at the Swap Agreement. The Court concludes that the terms of the transaction are reflected in four documents: (1) the Loan Proposal (Exh. 1); (2) the Term Sheet (Exh. 13); (3) the Term Loan Agreement (Exh. 34); and (4) the Swap Agreement (Exh. 58–64, Exh. 79).

Thrifty points to the fact the Loan Proposal (Exh. 1) states the Term Loan would have a fixed interest rate as evidence of the parties' intent to enter into a fixed rate loan. The Court concludes the Loan Proposal provides more than just that. First, portions of the proposal indicate that BofA intended to syndicate the Term Loan. (Exh. 1, Bates No. 12). Thrift does not dispute the fact that BofA needed to syndicate the Term Loan due to its amount and GWR's creditworthiness. (Linkenheil Decl. at 1:27–28, 2:1–10). Second, the Term Loan interest rate is listed as variable not fixed. (Exh. 1, Bates No. 13). BofA needed this characteristic in order to be able to syndicate the Term Loan. (Linken-

heil Decl. at 2:11–19). Third, the proposal includes a statement that the borrower will enter into an interest rate swap which would effectively provide GWR a fixed interest rate. (Exh. 1, Bates No. 13). The Term Sheet of January 10, 1990 (Exh. 13) incorporates most of the Loan Proposal terms with some adjustments as to the amount of the Term Loan and other minor changes not relevant to this Court's decision.

As to the actual Term Loan Agreement ("Agreement")(Exh. 34), Thrifty argues that its defined terms reflect that it was the parties' intent that the transactions be viewed as one agreement. The Court cannot agree with this analysis. The only definition in the entire Agreement which references both transactions is the term "Loan Documents." (Exh. 34, Bates Nos. 176–77). The Agreement defines the Swap Agreement separately and the Term Loan Documents separately. (Exh. 34, Bates Nos. 164 & 176). The Court is not persuaded that one definition in a 75–page agreement conclusively determines the nature of two separately defined transactions.

The Court finds it more compelling that the Term Loan Documents definition includes agreements that are included in the Loan Documents definition, such as the Hazardous Material Indemnity Agreement and the Guaranties, but the definition does not include the Swap Agreement. (Exh. 34, Bates No. 185). If the Swap Agreement was actually part of the Term Loan Agreement, it should have been included in the list of Term Loan Documents. Although, the Court agrees with Thrifty that the Term Loan Agreement states that it comprises "the complete and integrated agreement of the parties," (Exh. 34, Bates No. 238), it also states, "[e]ach Loan Document was drafted with joint participation of the respective parties thereto and shall be construed neither against nor in favor of any party, but rather in accordance with the *fair meaning thereof*" (Emphasis added)(exh. 34, Bates No. 239).

Examining the Swaps themselves, on each of the three days GWR entered into a swap with BofA, BofA executed a confirmation. (Exh. 58–64). Thrifty contends the fact that the parties only signed the ISDA Agreement

nearly two years after the actual Swaps took place reflect the unimportance of the Swap Agreement. The Court finds that this is not a material fact to the determination because each swap confirmation states that the Swaps would be governed by the ISDA Agreement. The ISDA Agreement states that the agreement and the confirmations constitute a single agreement between the parties. (Exh. 79, Bates No. 582). More compelling evidence that Swap Agreement was to stand alone is that there is no reference to the Terri Loan in the Swap confirmations nor the ISDA Agreement. In fact, the Term Loan was not listed in the ISDA Agreement as a credit support document (Exh. 79, Bates No. 603).

An agreement can have several transactions that stand alone. Here, the parties' intent was that they would enter into an agreement to participate in various transactions to allow GWR to effectively achieve a fixed rate loan. Thrifty takes the intent of the parties too far by arguing an integrated agreement is the same as an integrated transaction. John E. Elgin, former CFO of both GWR and Thrifty Oil, the debtors' primary negotiator for the transactions, states:

> [F]rom the very beginning both GWR and BofA envisioned that a term loan coupled with an interest rate swap would provide GWR with the equivalent of a low cost fixed rate term borrowing. (Elgin Decl. at 3:18–23).

This statement indicates GWR knew there would be two transactions and reflects that BofA did not disguise the transactions. The Court holds that the fair meaning of the language of each separately defined Loan Document creates rights and obligations that exist independently of each other.

### 2. Books, Records, Accounting Practices and other Extrinsic Evidence

Thrifty contends that BofA's own records reflect that the purpose of the Swap component of the transaction was to fix the interest

rate for the loan. Thrifty provides the Court with three examples: (1) BofA's Internal Standard Credit Memoranda (Exh. 23 & 24); (2) the financial statements BofA prepared for GWR (accounting for the swap payments as interest expense)(exh. 104); and (3) the swap brochure which describes an interest rate swap as an agreement between two parties to exchange a stream of interest payments over time (Exh. 55). Thrifty fails to provide evidence of how BofA treated the swap payments, claiming it irrelevant. The Court disagrees.

To collapse the two transactions into one, the Court must examine whether BofA treated the transactions as one. The Court finds at least five examples (which Thrifty does not dispute) that BofA treated the two transactions independently of each other. One example is that BofA maintained a swap portfolio separate from its loan operations. Another example is that GWR paid the Swap payments to the "Interest Rate Swap Operations" department and not to loan operations. Donald Strauss, a vice president of BofA, stated that BofA recorded the swap payments as trading account assets while interest rate payments of the Term Loan were recorded as loan assets.[4] (Strauss Decl. at 3:3–7). In addition, BofA's accounting system treats all of its swap portfolio the same and does not distinguish between swaps which hedge loans and other types of swaps. (Strauss Decl. at 3:19–22; 24–27). Finally, the most persuasive example is that the stream of Swap payments did not flow to all of the Bank Group members but to BofA alone. If the two transactions were to· be viewed as one, the Swap payments should have gone to the Bank Group as a whole for their risk in funding the loan.

In addition to the parties' treatment of the transactions, the Court finds other facts that support a conclusion that the Term Loan Agreement and the Swap Agreement created independent obligations. First, GWR bor-

---

**4.** Thrifty filed an evidentiary objection to the Strauss declaration because Strauss was never identified as a potential fact witness and that his testimony was based on a document that was not produced until after the discovery cutoff date. The Court overrules the Thrifty's evidentiary ob-

jection that he was never identified as a potential witness because although not named, he was a BofA employee that was generally referred to on the witness list. The Court will not consider any statements based on the late filed Exh. 172.

rowed an additional $7 million on the Term Loan but the Swap payments remained based on the original notional amounts. Second, prepayment of the Term Loan is not listed as a default event in the ISDA Agreement so the Swap payments would continue even if the Term Loan had been prepaid. (Exh. 79, Bates No. 585). Prior to the loan's closing, Scott Rosebrook ("Rosebrook"), former vice president of BofA's Risk Management Group, discussed with Mr. Elgin (Thrifty and GWR's CFO) the possibility that the Swap Agreement's separate obligations could exist even if the Term Loan never closed. (Rosebrook Decl. at 2:11–24). Rosebrook confirmed this in his Oct. 16, 1989 letter stating:

> Additionally, as mentioned in our conversation Friday evening, was the concern by Golden West management as to the extent of swap "breakage costs" in the unlikely event its planned financing fell through.

> Golden West may simply choose to leave its swap transaction in place and utilize the swap cashflows for current or future floating rate borrowings. However, if management wished to unwind the swap arrangement, determination of gain or loss is a function of the interest rate environment prevailing at the time of termination. (Exh. 56).

Finally, the interest rate payment due on the Term Loan was never included on any payment request for the Swaps. (BofA's Exh. 70–77).

The Court concludes that GWR understood that the Term Loan and Swap Agreement had to be structured so that BofA could syndicate the Term Loan and GWR could effectively have a fixed interest rate loan. GWR agreed to the structuring of the transaction. The facts show that the parties did not intend the Swap payments to compensate BofA for the risk and delay in the repayment of the Term Loan. In addition, no facts exist to indicate that this was a disguised agreement. What these two transactions accomplished was what both BofA and GWR intended—a marketable loan to syndicate and a hedged loan which eliminated interest rate

fluctuation risk. The Court cannot disregard the integrity of each of these transactions.

### 3. Section 502(b)(2) Policy Considerations

A final reason for not characterizing the termination damage claim as unmatured interest is that the policy concerns underlying section 502(b)(2) are not triggered. First, the termination damages are not accruing on an existing BofA claim to the detriment of other claimants. There is no prejudice to other creditors in allowing BofA's termination claim. Second, BofA's termination damages represent lost income which is not prohibited from recovery under section 502(b)(2). *In re Holm,* 931 F.2d 620, 623 (9th Cir.1991). Third, there was no uncertainty as to the amount of BofA's claim because it was set when the petition was filed based on the formula set forth in the ISDA Agreement. (Exh. 79). The Court concludes the policy underlying section 502(b)(2) is not furthered by a ruling that the termination damage claim is a claim for unmatured interest.

### B. Bucket Shop Laws

Thrifty argues that BofA's swap claim is not enforceable under California's Bucket Shop Laws.[5] Its primary argument is that an amendment to the Commodities Exchange Act, 7 U.S.C. § I *et seq.* ("CEA") did not retroactively preempt California's Bucket Shop laws as applied to the GWR–BofA Swaps. The Court does not reach this argument as it has decided that the Bucket Shop laws do not apply to the transaction at issue.

Bucket Shop Laws prohibit "wagering on the rise or fall of market prices of securities by means of fictitious transaction in such securities...." 57 Cal. Jur.3d (1980), Securities Regulations, § 7, pp. 258–259. Two characteristics of the interest rate swap between GWR and BofA lead this court to hold this Swap is not subject to the Bucket Shop Laws. First, the Swaps involved no security or commodity. Cal. Corp.Code section 29004 defines security as "all shares in any corporation or association ... and other evidences of debt or property and options for the purchase or sale thereof or any right

---

5. *See* Cal. Corp.Code §§ 29000–29201 (West 1997).

entitling the holder thereof to participate in profits or a division of assets." Section 29005 defines commodity as "anything movable that is bought and sold." GWR and BofA agreed to transfer a net payment stream (the swap payment) not any security or commodity. Second, pursuant to section 29008, a bucketing contract provides for a purchase or sale of a security or commodity where either one or both of the parties do not intend the actual delivery of the security or commodity. GWR and BofA fully intended to perform their payment obligations under the swaps—there was no fictitious transaction involved. The Court overrules Thrifty's objection based on California's Bucket Shop Laws.

### IV. CONCLUSION

The Court holds that there is no factual dispute as to the intent of the parties and declines to recharacterize the Term Loan and the Swap Agreement as a fixed rate loan. The parties' objective intent was to create two transactions: (1) a Term Loan with a variable rate and (2) interest rate Swaps. The documents, extrinsic evidence and policy considerations support this interpretation. Therefore, BofA's claim is not unmatured interest prohibited by 11 U.S.C. section 502(b). The Court also holds that California's Bucket Shop Laws do not apply to this case.

BofA's summary judgment motion is granted and its claim is allowed in the amount of $5,428.500. Counsel for BofA is directed to prepare an order in accordance with this Memorandum Decision within ten (10) days of the date of entry.