**In re COUNTY OF ORANGE, Debtor.**

**County of Orange, et al., Plaintiffs,**

**v.**

**Fuji Securities, Inc., Defendant.**

**Nos. SA CV 96–1010–GLT [SF], Bankruptcy No. SA 94– 22272–JR.**

United States District Court, C.D. California.

Dec. 16, 1998.

J. Michael Hennigan, Hennigan, Mercer & Bennett, Los Angeles, CA, for Plaintiffs.

Peter Aronson, Foley & Lardner, Los Angeles, CA, for Defendant.

## AMENDED SUMMARY ADJUDICATION OF *ULTRA VIRES* ISSUES

TAYLOR, District Judge.

The Court holds that, although they may have been unwise, speculative, or unduly risky, the reverse repurchase transactions made by the Orange County Treasurer in this case were not, on the theories presented here, *ultra vires* and thereby void under pre–1995 law. There was authority to act. Errors in the exercise of that authority, even grave errors, were not *ultra vires*.

### I. BACKGROUND

Faced with over a billion dollars in investment losses, the County of Orange has sued its former broker, Fuji Securities Inc., and numerous others, for liability on its losses. The County now moves for summary adjudication against Fuji on various *ultra vires* theories, claiming the reverse repurchase transactions entered into by its former Treasurer were *ultra vires,* and therefore void. Fuji opposes the County's motion, and files its own cross-motion to adjudicate the *ultra vires* issues in its favor. The cross-motions squarely present the *ultra vires* issues,[1] those issues have been fully briefed and argued,[2] and the matter is ready for summary adjudication.[3]

Repurchase agreements, commonly called "repos" in the financial community, refer to both repurchase and reverse repurchase transactions. A repo transaction is "a purchase of securities by the local agency pursuant to an agreement by which the counter-

---

1. The positions of the parties were augmented by several helpful *amicus* briefs.

2. Cross-motions for partial summary judgment on similar *ultra vires* issues were also filed but not heard due to a settlement in the related *County of Orange et al. v. Merrill Lynch & Co., Inc. et al.,* SA CV 95–37–GLT. Extensive materials were filed in conjunction with the related motions. The Court ordered all materials filed on the related motions incorporated into the record. *See* Transcript 7/13/98. Reference in this Order to these related materials is prefaced by "ML."

3. This Opinion addresses only the *ultra vires* claims properly raised in the cross-motions. The Court makes no rulings regarding the merits of other claims, defenses, or the Treasurer's conduct.

party seller will repurchase the securities on or before a specified date and for a specified amount."[4] Cal. Gov't Code § 53601(i)(6). A reverse repo transaction is "a sale of securities by the local agency pursuant to an agreement by which the local agency will repurchase the securities on or before a specified date and includes other comparable agreements."[5] *Id.*

The profitability of a reverse repo transaction arises from a positive spread (positive arbitrage) between cost of the repo transaction and the expected yield from reinvesting the repo proceeds. To realize positive arbitrage some risk must be taken. The positive arbitrage is a "credit risk"—the positive spread between the repo rate and the expected higher yield on a riskier instrument. The profits represent the risk that the less secure issuer may default. A seller wanting exposure only to "interest-rate risk" would sell an instrument on a reverse repo, and reinvest the proceeds in a longer-term security having a similar credit rating. The positive arbitrage under this circumstance represents the positive spread between the repo rate (shorter term interest rate) and the expected yield on the longer term security. The profits represent the risk that the longer term instrument will continue to earn higher interest than the shorter term instrument.

The reverse repo transactions at issue here were vulnerable to interest rate risk, or, as labeled by the County, they were "mismatched." The County defines a "matched position" as a transaction where the repo proceeds buy an investment which matures on or before the repurchase date, and has a

yield slightly higher than the repo interest expense. The County argues that, had the Treasurer reinvested reverse repo proceeds in a "matched" position, he likely would have earned a small supplemental income for the County portfolio while exposing the County only to credit risk, i.e., the risk of issuer default.

Here, however, the Treasurer engaged in significantly "mismatched" and speculative positions.[6] The proceeds of the repos were used to purchase investments which matured well after the repurchase date, but with a markedly higher yield. In exchange for the high yield, the County was exposed to great interest rate risk. The Treasurer had to speculate whether the transactions would remain profitable through the duration of the repo.

### A. California's Authorization of Reverse Repo Investments

In 1975 the State of California began studying the suitability of repos as an investment device. In a report commissioned by the California Legislature, the Auditor General concluded public entities could safely use reverse repo transactions to make small incremental increases in yield, without incurring substantial risk. *See* Report to Joint Legislative Audit Committee, *Evaluation of General Proposals to Allow State and Local Investment Authorities in California to Increase Investment Income by Temporarily Lending Investment Securities Through Security Loans and Reverse Repurchase Agreements*, at 19–20 (1975). The recommendation to the California Legislature was

---

**4.** The original sale and repurchase price is typically less than the prevailing market value of the securities. This differential is sometimes referred to as the "haircut" and represents a reduction of the value of securities to reflect the risk of loss. *See* M. Thomsett, Investment and Securities Dictionary 125 (1986).

**5.** For the purposes of this order, repurchase and reverse repurchase transactions are defined as set forth in the California code. Other organizations have adopted an inverse definition:

A repo is a transaction in which securities are sold subject to an agreement to repurchase; a reverse repo is a transaction in which securities are bought subject to an agreement to resell.

ML–Brief Amicus Curiae of the Federal Reserve Bank of New York at 2; *see also Matter of Bevill, Bresler & Schulman Asset Management Corp.*, 67 B.R. 557, 566–67 (D.N.J.1986); ML–Brief Amicus Curiae of the Bond Market Association in Support of Merrill Lynch at 6.

**6.** The County recognizes that, under certain circumstances, a mismatched position can still be relatively safe. For example, certain mismatched positions are not particularly vulnerable to interest rate fluctuations. The transactions entered into by the Treasurer here, however, were illiquid, mismatched, and made the achievement of supplemental income very speculative.

that any legislation authorizing investment in repos:

> Limit[ ] the purpose of a reverse repurchase agreement ... to prudently supplementing the net additional interest income normally received from such securities.

*Id.* at 20. When properly used, the report suggests, reverse repo agreements could earn approximately a ⅜ of 1 percent spread between cost of the repo transaction and the interest earned on the investments acquired with the proceeds. *Id.* This assessment assumes, however, the transactions would be closely matched, i.e., proceeds would be used in investments having a maturity at or almost at the repurchase date.

Despite this guarded assessment, in 1976 the California legislature gave the State of California unconditional authorization to enter into reverse repo agreements:

> The State Treasurer may enter into repurchase agreements or reverse repurchase agreements of any securities described in Section 16430.

Cal. Gov't Code § 16480.4. In 1979 the California legislature extended the same unconditional powers to local agencies. Cal. Gov't Code § 53601(i) (1979). These grants of authority seemingly omit the cautionary concern of the Auditor General Report.

### B. *Orange County's Investment Strategy*

The investment pools managed by the Treasurer consisted of public funds deposited by various local governments or districts (the "Participants"). As of December 1994 the pools held approximately $7.6 billion in Participant deposits. Through reverse repos, the Treasurer ultimately leveraged the investment portfolio to a book value of more than $20.6 billion.

The Treasurer's investment strategy involved two basic steps: (1) obtaining funds by selling securities through reverse repo transactions and contemporaneously agreeing to repurchase the underlying securities in less than 180 days; and (2) reinvesting the proceeds of the reverse repos in long-term

debt instruments, with a maturity of two to five years. Any difference between the lower short term interest rates and the higher long term interest rates would be profit for the County's portfolio.

The Treasurer speculated heavily by "rolling over" new repo transactions to pay off old ones. He also "stacked" the transactions by using earlier reverse repos as collateral for later reverse repos, using the proceeds to buy more securities.

Success with this investment strategy was dependent on the Treasurer's ability to predict that interest rates would stay low. Since the market value of a fixed rate note moves inversely to interest rates, if interest rates increased the value of the County's long-term investments fell. If interest rates increased sufficiently, the Treasurer could be left with insufficient funds to pay off the repurchase obligation at the maturity of the reverse repurchase instrument.

During a period of largely steady and declining interest rates from 1991 to 1993, the Treasurer's reverse repurchase strategy was highly profitable, yielding hundreds of millions of dollars in excess investment earnings. By early December 1994, however, due to rising interest rates the Pools had an unrealized decline in market value of about $1.5 billion. On December 6, 1994, Orange County filed Chapter 9 bankruptcy. Between early December 1994 and January 20, 1995, the Pools' securities portfolio was liquidated, incurring a loss of almost $1.7 billion on the Participants' deposits of $7.6 billion— a 22.3% loss.

### C. *Fuji's Involvement*

The Treasurer entered into reverse repo transactions with at least twenty-two broker-dealers. Before 1994 the Treasurer and Fuji had only two reverse repo transactions. In 1994, Fuji became a more frequent participant. In total, Fuji supplied about $4.07 billion in reverse repo proceeds, less than 10% of the County's total reverse repurchase volume.[7] About $3.84 billion of the repos

---

7. Although these motions only address the reverse repo transactions, Fuji and the County had other transactions during the same time period.

For example, in September 1994 Fuji sold the County $50 million of five-year securities issued by the Federal National Mortgage Association

entered into by the County with Fuji were used to refinance existing transactions.

## II. *DISCUSSION*

■ An *ultra vires* act is one "performed without any authority to act ... [An] *ultra vires* act of a municipality is one which is beyond powers conferred upon it by law." Black's Law Dictionary 1522 (6th ed.1990). An ordinary error in the exercise of that power is not sufficient to sustain an *ultra vires* claim. *See, e.g., Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 690, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949); *City of Oakland v. Key System,* 64 Cal.App.2d 427, 441, 149 P.2d 195 (1944).

■ County officials only have powers which are (1) expressly granted by the state constitution or by state statute or (2) necessarily implied by such express grants. Cal. Gov't Code § 23003. "[T]he authority of each officer, board, or department to exercise any of the corporate power with which the municipality has been clothed must be distinctly conferred upon that officer, board, or department, or its act will create no obligation against the municipality." *Von Schmidt v. Widbur,* 105 Cal. 151, 159, 38 P. 682 (1894). Any reasonable doubt concerning the existence of a power is resolved by the courts against the municipality. *Id.* at 157, 38 P. 682.

On August 20, 1985, the County delegated its investment authority to the Treasurer under Resolution 85–1221 and Cal. Gov't Code § 53607.[8] By California law, once a treasurer is delegated authority to invest, the treasurer is free to invest in a variety of securities, including reverse repo transactions. *See* Cal. Gov't Code §§ 53601(i), 53635(i).

■ The County asserts the speculative transactions at issue were outside the limited authority of Orange County's Treasurer. If these transactions were *ultra vires,* certain results would follow:

> The most important one is that contracts wholly beyond the powers of a municipality are void. They cannot be ratified; no estoppel to deny their validity can be invoked against the municipality; and ordinarily no recovery in quasi contract can be had for work performed under them.

*Los Angeles Dredging Co. v. City of Long Beach,* 210 Cal. 348, 353, 291 P. 839 (1930); *see also Thomas v. City of Richmond,* 79 U.S. (12 Wall.) 349, 20 L.Ed. 453 (1870).

■ Under California law, the rules of statutory construction are the same whether applied to the California Constitution or a statutory provision, *Winchester v. Mabury,* 122 Cal. 522, 527, 55 P. 393 (1898), and interpretation of these provisions is a question of law for the courts. *Culligan Water Conditioning v. State Bd. of Equalization,* 17 Cal.3d 86, 93, 130 Cal.Rptr. 321, 550 P.2d 593 (1976).

■ If the clear and unambiguous language can resolve a question of statutory interpretation, California law requires the court look no further to search for legislative intent. *See Delaney v. Superior Court,* 50 Cal.3d 785, 798, 268 Cal.Rptr. 753, 789 P.2d 934 (1990); *see also Brown v. Kelly Broadcasting Co.,* 48 Cal.3d 711, 724, 257 Cal.Rptr. 708, 771 P.2d 406 (1989). The words of the statute are given "their usual and ordinary meaning." *Lennane v. Franchise Tax Bd.,* 9 Cal.4th 263, 268, 36 Cal.Rptr.2d 563, 885 P.2d 976 (1994). Additionally, "[w]ords must be construed in context, and statutes must be harmonized, both internally and with each other, to the extent possible." *Woods v. Young,* 53 Cal.3d 315, 323, 279 Cal.Rptr. 613, 807 P.2d 455 (1991). "Interpretations that lead to absurd results or render words surplusage are to be avoided." *Id.*

("FNMA"). Also, in spring 1994 Fuji sold the County a series of short-term discount notes which ultimately yielded a positive return. Jacobson Dep. p. 2920.

8.  Then-applicable Cal. Gov't Code § 53607 stated:

> The authority of the legislative body to invest or to reinvest funds of a local agency, or to sell or exchange securities so purchased, may be delegated by the legislative body to the treasurer of the local agency, who shall thereafter assume full responsibility for such transactions until such time as the delegation of authority is revoked, and shall make a monthly report of such transactions to the legislative body.

■ If a court cannot determine the intent from the plain meaning of the words used, the court may also examine legislative history, the evils sought to be remedied, public policy, and contemporaneous administrative construction. *DiGiorgio Fruit Corp. v. Dept. of Employment,* 56 Cal.2d 54, 61–62, 13 Cal.Rptr. 663, 362 P.2d 487 (1961); *Mudd v. McColgan,* 30 Cal.2d 463, 470, 183 P.2d 10 (1947); *Veterans' Welfare Board v. Jordan,* 189 Cal. 124, 136, 208 P. 284 (1922).

### A. County's First Counterclaim—Violation of California Constitution Article XVI, Section 18 and California Government Code Section 29120

In its First Counterclaim,[9] the County alleges the Treasurer's use of reverse repos was unauthorized by the California Constitutional Debt Limitation (Calif. Const.Art. XVI, § 18) and the municipal budgeting statute (Cal. Gov't Code § 29120).[10]

#### 1. California's Constitutional Debt Limit

■ The County contends the treasurer's use of reverse repo transactions as a device to invest local government money violated Article XVI ["Public Finance"], § 18 of the California Constitution (the "Constitutional Debt Limit" or "Debt Limit"). The Court concludes the Debt Limit was not violated because the reverse repurchase transactions did not, within the meaning of the constitutional provision, create excess indebtedness or liability at the outset of the transaction.

The Constitutional Debt Limit provides:

No county, city, town, township, board of education, or school district, shall incur any indebtedness or liability in any manner or for any purpose exceeding in any year the income and revenue provided for such year, without the assent of two-thirds of the qualified electors thereof, voting at an election to be held for that purpose ...

Cal. Const., Art. XVI, § 18.

■ The County asserts this provision, which limits the ability of a county to enter into contractual obligations, makes the Treasurer's use of reverse repos *ultra vires.* The County argues reverse repos are a form of "indebtedness or liability" under the Debt Limit, and the amount "owed" on the agreements was incurred without a popular vote or unappropriated revenues for the current fiscal year.[11] As recognized by the California Supreme Court, any contract entered into in violation of the Debt Limit would be *ultra vires* and, therefore, void.

[I]n giving effect to this [section] ... it will not be strange if some shall be found to

---

9. In its Second Amended Complaint, the County has labeled its non-bankruptcy claims "counterclaims."

10. Although scarcely mentioned in the briefing, the County's First Counterclaim also contends the Treasurer's use of reverse repos violated Cal. Gov't Code §§ 25256 and 23006. Section 25256 uses language identical to the Constitutional Debt Limit and states:

Except as permitted by the Constitution, the board shall not for any purpose contract debts or liabilities which exceed in any fiscal year the income and revenue provided for that year.

Any debts or liabilities contracted and any allowances made contrary to this section are void. The auditor shall not draw nor shall the treasurer pay any warrant therefor.
Cal. Gov't Code § 25256.
Section 23006 states:
Any contract, authorization, allowance, payment, or liability to pay, made or attempted to be made in violation of law, is void, and shall not be the foundation or basis of a claim against the treasury of any county.
Cal. Gov't Code § 23006.

The County's claims appear to be based on the same arguments that underlie the County's Art. XVI, § 18 theory, and the ruling is the same.

11. The County also contends at least some of the reverse repo transactions violated Art. XVI, § 18 because they were entered into in one fiscal year (*i.e,* 1991–1992) but had a repurchase date in a later fiscal year (*i.e.,* 1992–1993), thus improperly requiring the application of money from a later year to meet an earlier year's indebtedness or liability. The California Supreme Court, however, has held that, as long as there is actual or anticipated income and revenue attributable to the fiscal year in which an indebtedness or liability is incurred, both the actual date such income is received and the actual date of payment are irrelevant and cannot invalidate the transactions. *See e.g. Riley v. Johnson,* 6 Cal.2d 529, 531, 58 P.2d 631 (1936) (finding the issuance of notes in one fiscal year which would be redeemed in a later fiscal year did not violate the California constitution); *Voorhees v. Morse,* 1 Cal.2d 179, 190, 34 P.2d 153 (1934). Here, *at the time the obligations were incurred* the means to pay the obligation were simultaneously provided, so there was no excess indebtedness or liability.

suffer. But it must be remembered that all are presumed to know the law, and that whoever deals with a municipality is bound to know the extent of its powers. Those who contract with it, or furnish it supplies, do so with reference to the law, and must see that limit is not exceeded. With proper care on their part and on the part of the representatives of the municipality, there is no danger of loss.

San Francisco Gas Co. v. Brickwedel, 62 Cal. 641, 642–43 (1882).

The California Supreme Court has interpreted and applied the Debt Limit as referring to a specific and narrow time—the outset of a transaction. The court has not interpreted the Debt Limit as a watchdog statute to oversee financial transactions as they unfold, possibly resulting in contingent obligations which may later become debts or liabilities.

Here, at the outset of each transaction, the Treasurer's investments were potentially profitable. When the County incurred the obligations there was a positive spread between the repo rate and the expected yield on the long-term instruments. These profits were exposed to risk, but the risk of loss was contingent on interest rates rising in the future to levels which would jeopardize the investments. When an obligation is incurred, but revenue sufficient to discharge the obligation is simultaneously provided, no excess indebtedness or liability is incurred within the limited meaning of the Constitutional Debt Limit. The Court concludes the reverse repurchase transactions entered into by the Treasurer with Fuji did not violate the Constitutional Debt Limit as narrowly interpreted and applied by the California Supreme Court and, therefore, are not *ultra vires*.

### a. Construction of Constitutional Debt Limit—Outset of the Transaction

■ Under the Debt Limit, a municipal body cannot incur debt or liability exceeding the income and revenue provided for such year. The validity of a transaction, whether it creates indebtedness or liabilities, is measured at the time the transaction is entered into. *See, e.g., Arthur v. City of Petaluma,* 175 Cal. 216, 223–24, 165 P. 698 (1917); *Buck v. City of Eureka,* 124 Cal. 61, 68, 56 P. 612 (1899). Courts examining a potential violation of the Debt Limit are not directed to sit in *post hoc* judgment of the *wisdom* of a municipality's income and revenue estimates. *See City of Oakland v.. Williams,* 15 Cal.2d 542, 551–52, 103 P.2d 168 (1940).[12] A sum which may be payable in the future as a contingency arises is not a debt at the outset of the transaction. *Doland v. Clark,* 143 Cal. 176, 181, 76 P. 958 (1904).

■ The terms "indebtedness" and "liability" as used in Section 18 "are not employed in a technical sense, but have specific reference to the basic warrant and legislative authority on which a state contract must rest and on which alone a public debt must find its sanction in order to obligate a state to pay." 63 Ops.Cal.Atty.Gen. 840 (1980).[13]

■ The California Supreme Court has found that the purpose of the Debt Limit is apparent from the plain language of the section. First, the provision is meant to establish "the 'pay as you go' principle as a cardinal rule of municipal finance." *Westbrook v. Mihaly,* 2 Cal.3d 765, 776, 87 Cal.Rptr. 839, 471 P.2d 487 (1970); *vacated on other grounds,* 403 U.S. 915, 91 S.Ct. 2224, 29 L.Ed.2d 692 (1971). Additionally, the provision seeks to ensure the actual cost of munic-

---

**12.** The County argues the Court should hold a trial to determine whether the Treasurer's speculation was "reasonable." This argument understates the deference § 18 accords to municipalities. A municipality is "clothed with discretion quasi judicial, which, like all discretion, may be abused. But, in the absence of charges of fraud, the Courts will not review their action, upon the ground that they were mistaken in a particular instance." *Babcock v. Goodrich,* 47 Cal. 488 513–14 (1874). Here, evidence of unwise or unduly risky investing has been shown, but there

is no evidence of fraud at the outset of the transaction. The reasonableness or unreasonableness of the Treasurer's speculation does create a material issue of fact for the purposes of a § 18 analysis.

**13.** Opinions of the Attorney General, although not binding, are entitled to considerable weight. *State of Cal. ex rel. State Lands Com. v. Superior Court,* 11 Cal.4th 50, 71, 44 Cal.Rptr.2d 399, 900 P.2d 648 (1995).

ipal government is closely reflected in the tax rate and give the people the ultimate power of approving or rejecting projects requiring long-term expenditures. *Id.*

### b. *Reverse Repo Transactions*

Whether reverse repo transactions create excess indebtedness or liability in violation of California's Debt Limit is a question of first impression. The Court looks to the economic substance of the transaction to determine whether excess indebtedness or liability has been incurred. *City of Los Angeles v. Offner*, 19 Cal.2d 483, 486, 122 P.2d 14 (1942) (recognizing the constitutional validity of an obligation is determined by its substance, rather than its form or label). The parties have shown the Court an extensive review of how other areas of law and finance have analyzed the economic substance of reverse repo transactions. Although informative, none of the examples discussed below dispositively answer whether the County incurred excess indebtedness or liability at the outset of the transactions.

### (1). *Reverse Repos and Collateralized Loans*

The pending motions debate at length whether reverse repos are purchase/sale transactions or camouflaged collateralized loans. The County urges the Court to find reverse repos are essentially collateralized loans. Such a finding would benefit the County since a 1980 California Attorney General opinion concluded certain collateralized loans create debts within the meaning of

§ 18.[14] 63 Op.Cal. Att'y Gen. 840 (1980). The Court concludes that, although reverse repos are similar to collateralized loans in many ways, reverse repos are different from collateralized loans in the context of the Debt Limit.

Both repos and collateralized loans involve temporary exchange of a security for cash. In both transactions, at maturity the cash is returned to the initial seller, plus a transaction charge, and the security is returned to the initial buyer. With both transactions the security is marked to market on a daily basis so, if the collateral value drops, the buyer can request additional collateral. In both transactions the institution providing the cash is not exposed to market risk, since a fluctuation in the market value of the underlying security will not affect the investor's return.

In other respects, a reverse repo is different from a collateralized loan. A lender on a secured loan takes collateral. A repo buyer takes title. A 1964 California Attorney General opinion concluded that because of the passage of title a repo transaction is a "simultaneous purchase-sale agreement," not a loan. 44 Op.Cal. Att'y Gen. 140–43 (1964). Others have reached the same conclusion.[15] *See, e.g., In re Comark*, 145 B.R. 47, 53 (B.A.P.9th Cir.1992) (repos not secured loans under pre-section 559 bankruptcy law); *In re Residential Resources Mortgage Investments, Corp.*, 98 B.R. 2, 23–24 (Bankr. D.Ariz.1989) (concluding repo transactions should be viewed as purchases and sales of securities for purposes of the "securities con-

---

14. In 1980, the California Attorney General issued an opinion which concluded under certain circumstances a collateralized loan creates a debt under the Constitution. The opinion considered whether the State Treasurer could borrow against time deposits at a lower rate of interest, and use the borrowed funds to invest for higher returns. The Attorney General concluded, "the encumbering of existing state property as security for such loan constitutes a debt within the purview of the constitutional provision." 63 Op.Cal. Att'y Gen. 840 (1980). The opinion concluded the State Treasurer could not borrow against time deposits, whether for purposes of investment or otherwise, without compliance with the procedures set forth in the California Constitution. Any such contractual obligations without compliance with constitutional procedures would be void (citing *Veterans' Welfare*

*Board v. Jordan*, 189 Cal. 124, 134, 208 P. 284 (1922)).

15. As summarized by the Bond Market Association:

> Repos are structured by the parties as purchase and sale but are hybrids in the sense that they have certain features that resemble other transactional forms. In contexts such as commercial law and the antifraud provisions of federal securities laws, they generally are viewed as purchases and sales. For other purposes, such as taxes, they are typically viewed as financing. For accounting purposes, they may be viewed either way depending upon particular factors.

ML—Brief Amicus Curiae of the Bond Market Association in Support of Merrill Lynch at 14–15.

tract" provisions of the Code); 12 C.F.R. § 32.103 (federal banking regulations which set lending limits for commercial banks have concluded that a repurchase agreement involving federal securities is "not a loan or extension of credit").

A similarity in some functional attributes does not make a reverse repo a collateralized loan under Section 18.[16] Instead, "[t]he foregoing discussion leads to one inescapable conclusion: repos and reverse repos are hybrid transactions which do not fit neatly into either a secured loan or purchase and sale classification." *Matter of Bevill, Bresler & Schulman Asset Management Corp.*, 67 B.R. 557, 596–97 (D.N.J.1986). In the § 18 context, any attempt to label the transactions at issue is an unproductive exercise.

Resolution of this motion does not depend on labels, but on whether the underlying transactions, at the outset, created excess indebtedness or liability.[17] The distinction, in the context of § 18, is not the passage of title. The reverse repos at issue here are distinct from collateralized loans because they were coupled reinvestments which, at their outset, appeared to provide sufficient funds to repurchase the underlying security and pay for the cost of the transaction. For the purposes of this § 18 Debt Limit analysis, the Court finds the reverse repos at issue

here were not substantively equivalent to collateralized loans.

### (2). *Reverse Repos in Other Contexts*

The County contends "market participants and regulators, including BMA and the Federal Reserve Bank [ ], in direct contradiction to the position they have taken as *Amicus Curiae*, routinely recognize that repurchase transactions involve the borrowing and lending of money." County's Response to Amicus Curiae Briefs at 1. The County notes that the Federal Reserve System defines extensions of credit to include repurchase transactions, *see* 12 C.F.R. § 215.3, the Board of Governors of the Federal Reserve has cautioned that some reverse repurchase transactions may trigger lending limits, *see* Supervisory Policy Statement on Repurchase Agreement Transactions, 50 Fed.Reg. 47451, 47452 (1985), and the Bond Market Association once stated repo agreements "involve the lending and borrowing of all types of financial assets." *Repo Market Continues to Grow in Importance*, RESEARCH QUARTERLY at 4 (Nov.1996).

These isolated statements are not controlling here. For example, the Board of Governors of the Federal Reserve in issuing its supervisory policy was simply highlighting uncertainty regarding the applicability to re-

---

**16.** The County asserts "the United States Supreme Court has already established that reverse repurchase agreements are substantively analogous to collateralized loans." County's Response to Amicus Curiae Briefs at 6–7 (citing *Nebraska Dept. of Revenue v. Loewenstein*, 513 U.S. 123, 130, 115 S.Ct. 557, 130 L.Ed.2d 470 (1994)). *Loewenstein*, however, expressly limits its findings as applicable to repo transactions as they arise under the tax code.

> Our decision today is an interpretation only of 31 U.S.C. § 3124(a)—not the Securities Exchange Act of 1934, the Bankruptcy Code, or any other body of law ... [The repo market could be impaired] if repurchase agreements were to lose their present characteristics of flexibility and liquidity, or if repos became "unavailable" to certain kinds of public and private institutional investors. These possibilities might develop if repos were to be characterized as secured loans for purposes of federal bankruptcy and banking law or of commercial and local government law. *Our decision today, however, says nothing about how repos should be characterized for those purposes.*

*Id.* at 134, 136 (emphasis added).

The United States Supreme Court has not issued an opinion ruling on how reverse repo transactions should be characterized across the board or in the municipal finance arena. Nonetheless, the label is irrelevant. The only relevant inquiry under Section 18 is whether the County incurred excess indebtedness or liability at the outset of the transaction when it entered into the reverse repos.

**17.** A contrary analysis was conducted in *Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*, 17 F.Supp.2d 275 (S.D.N.Y.1998). *Granite Partners* was an Article 9 case. Under New York and Second Circuit precedent, "[t]he key to the inquiry as to whether the repose in this case should be characterized as purchase and sale agreements or secured loans lies in the intentions of the parties." *Id.* at 298. Looking to the intent of the parties, the court concluded since "the parties intended the transaction to be treated as a purchase and sale" the repo agreements at issue were purchase/sale transactions. *Id.* The New York and Second Circuit precedents are not applicable to the case at bar.

pos of both state and federal lending limits. Supervisory Policy, *supra,* at 47452. It was due to this uncertainty and "as a matter of prudent banking" that the Board made its recommendation. *Id.* Analysis of the many conflicting examples is ultimately unproductive.[18] In sum, these statements reflect views of the same complex transaction from different perspectives and with different assessment goals.

This evidence is useful, however, to illustrate why courts examining different statutes or regulations have reached different conclusions about the nature of repos. *Compare Nebraska Dept. of Revenue v. Loewenstein,* 513 U.S. 123, 130, 115 S.Ct. 557, 130 L.Ed.2d 470 (1994) (finding reverse repos should be treated as collateralized loans for the purposes, and solely for the purposes, of 31 U.S.C. § 3124(a)), *with In re Comark,* 145 B.R. 47, 53 (B.A.P.9th Cir.1992) (repos not secured loans under pre-section 559 bankruptcy law). Different statutes have distinct purposes which warrant corresponding levels of examination. Different levels of examination result in different conclusions.

Section 18 requires courts to examine a specific and narrow time—the outset of a transaction. The Debt Limit was not drafted to eliminate uncertainty or risk. The Debt Limit does not set performance standards. Thus, characterization of repos under the Debt Limit unsurprisingly leads to different conclusions than characterization of repos under other statutes and regulations.

### c. *Conclusion*

Based on the foregoing analysis, the Court concludes the subject reverse repurchase transactions were not *ultra vires* under Section 18 because they did not create excess indebtedness or liability at the outset of the transaction.

■■■ The evidence shows the Treasurer engaged in highly risky investments, which led to great losses. However, the Constitutional Debt Limit provision only examines whether, at the outset of the transaction, the County incurred excess indebtedness or liability. It does not prohibit risk, or even excessive risk, and it would be incorrect for the Court to read such a prohibition into the California Constitution. It is the role of the legislature, not the Court, to ensure the laws protect public funds.

### 2. *Government Code § 29120—Budget Requirement*

To ensure public obligations and expenditures are formally considered and subjected to public scrutiny before they are incurred, county officials generally cannot lawfully incur obligations or make expenditures unless a budget appropriation authorizes the obligation or expenditure. *See* Cal. Gov't Code §§ 29000–29144, 30200. The Accounting Standards and Procedures promulgated by the State Controller contain no requirement that investment expenditures generally, or

---

**18.** Two additional arguments by the County require discussion. First, the County argues § 53601(i)(6)(D) as amended in 1995 proves that the legislature believes reverse repo transactions are borrowing transactions. ML–Opp. at 43, n. 46. The amendment referred to by the County provided:

> For purposes of this section, the base value of the local agency's pool portfolio shall be that dollar amount obtained by totaling all cash balances placed in the pool by all pool participants, excluding any amounts obtained through selling securities by way of reverse repurchase agreements or other similar borrowing methods.

§ 53601(i)(6)(D). The amendments make no mention of the Constitutional Debt Limit and do not alter the legislature's definition of repos as "sale/repurchase" transactions. Instead, the amendments exclude repo from the base value measurement. Since base value is the measure-

ment used to calculate how much can be invested in reverse repo transactions, the exclusion of reverse repo transactions from the base value calculation is logical and does not imply such transactions are borrowings.

Second, the County paraphrases the New York Fed as concluding that reverse repos fall within the wide definition of constitutionally restricted "liabilities." County's Response to Memorandum of Certain Broker Dealer Defendants at 1 n. 1. The County has misconstrued the New York Fed's position which declined to "advise the Court on the correct interpretation of the California Constitution." Instead, the New York Fed noted "that the language of Article XVI, § 18 does not, on its face, require the Court to engage in a characterizations exercise in order to determine its applicability to repo transaction[s]." ML—Memorandum of Law of the Federal Reserve Bank of New York as Amicus Curia at 9.

reverse repo expenditures in particular, be appropriated.

However, the County argues that the California statute requires budgets be prepared in accordance with Generally Accepted Accounting Principles ("GAAP"). The County also argues GAAP and Governmental Accounting Standards Board Statement 3 ("GASB 3") require interest obligations for reverse repo agreements be separately stated in the budget. Since the County's budgets never contained appropriations for any obligations or expenditures resulting from reverse repo transactions, the County argues the payments made in accordance with the reverse repo transactions were *ultra vires* and void.

The County's theory fails for three reasons. First, California law does not require that counties adhere to every GAAP principle when preparing budgets. Second, even if GAAP were to apply, GASB 3 would not apply since it is a financial statement disclosure requirement, not a budgeting rule. Third, the analogy of reverse repo transactions to temporary borrowings is unfounded.

### a. Generally Accepted Accounting Principles ("GAAP")

The County's first premise is that GAAP applies to California's county budgets.

■ Section 29005 of the Government Code states "[t]he Controller shall promulgate such rules, regulations, and classifications as are deemed necessary and commensurate with the accounting procedures for counties prescribed pursuant to Section 30200...." Cal. Gov't Code § 29005. "[T]he Controller shall prescribe for counties uniform accounting procedures *conforming* to generally accepted accounting principles." Cal. Gov't Code § 30200 (emphasis added). The Controller's uniform procedures are set forth in the State of California Accounting Standards and Procedures for Counties. *See* CAL. ACCT. STANDARDS & PROC. FOR COUNTIES (1992).

Under § 30200, any accounting procedure promulgated by the State Controller must *conform* to GAAP. Section 30200 does not provide the GAAP rules should be used to fill in where the State Controller has not promulgated a budget rule on a particular issue.[19]

The State Controller has defined GAAP as applying only to the form and content of financial statements. GAAP is not defined as applying to the form and content of county budgets. CAL. ACCT. STANDARDS & PROC. FOR COUNTIES App. C at 27. Moreover, the Controller has expressly distinguished between GAAP standards and budgetary practices. "Budget–GAAP Differences" are defined as "[d]ifferences between the GAAP reporting model and a government's budgetary practices." *Id.* at 10. Likewise, the definitions of "Budget–GAAP Perspective Differences," "Budget–GAAP Entity Differences," and "Budget–GAAP Basis Differences" recognize similar distinctions. *Id.* at 10–11. In light of these facts, the Court finds that, where the State Controller has not promulgated a budget rule on a particular issue, GAAP rules do not automatically apply in their absence.

### b. Governmental Accounting Standards Board Statement 3 ("GASB 3")

■ The County's second premise—that GASB 3 contains a requirement that reverse repo obligations be budgeted—is unfounded. GASB 3 provides financial reporting guidance, not budgeting rules:

Scope of this Statement

1. This Statement provides guidance for disclosures by governmental entities about deposits with financial institutions, investments, and reverse repurchase agreements. It also provides accounting and financial reporting guidance for repurchase and reverse repurchase agreements.

GASB 3 at 1. Disclosures are meant to "help users of state and local governmental finan-

---

**19.** The revised County Budget Act was drafted to "[d]elcte antiquated terminology and update definitions to *comply* with the generally accepted accounting principles and practices[.]" Assembly Local Government Committee Report on AB

820. An express intent to comply with GAAP, like an intent to conform with GAAP, does not mean the legislature intended GAAP fill in regulations where the County Budget Act is silent.

cial statements assess the risks an entity takes in investing public funds." *Id.* at 18. Financial statements are a "fair presentation of the financial position and results of operations of an entity in conformity with GAAP." CAL. ACCT. STANDARDS & PROC. FOR COUNTIES App. C at 9.

GASB 3 obligates a municipality to create historical disclosure documents. GASB 3 does not contain any obligation to create a financial plan of expenditures and proposed means for financing them. *Cf. id.* at 10 (defining a budget as a "plan of financial operation embodying an estimate of proposed expenditures for a given period and the proposed means of financing them"). GASB 3 sets no obligation for a County to budget funds to cover obligations which may be created over the life of a reverse repo transaction.

#### c. *Temporary Borrowings*

■ The County also contends that, since they are analogous to temporary borrowings, reverse repo transactions must receive specific budget appropriations.

Article 7 ["Temporary Borrowings"] provides "[t]he legislative body of each local agency *may* include in its budget, separately stated, amounts of anticipated disbursement to meet the interest to be paid on any funds borrowed pursuant to *this article.*" Cal. Gov't Code § 53833 (emphasis added). "This article" refers to Article 7. Reverse repos are not discussed in Article 7. Instead, reverse repos are authorized in Article 1 ["Investment of Surplus"]. *See* Cal. Gov't Code § 53601. Thus, reverse repos are not implicated by § 53833.

■ Assuming reverse repos were akin to temporary borrowings within Article 7,[20] the section states municipalities *may* budget for the interest expense of reverse repo transactions. Thus, municipalities are free *not* to do so. Under this permissive lan-

---

**20.** Although reverse repo transactions are similar to temporary borrowings in many respects, the legislature has expressly and consistently labeled reverse repo transactions as sales/repurchases, not temporary borrowings.

**21.** The inapplicability of § 29120 can also be inferred from how the Legislature amended

guage, it would be within the County's discretion to refrain from budgeting anticipated reverse repo obligations. Since an act is *ultra vires* only if the local government completely lacked the power to undertake it, any exercise of such discretion would not be *ultra vires.*[21]

Summary Adjudication of the County's First Counterclaim is GRANTED in Fuji's favor. The transactions at issue did not violate the Constitutional Debt Limit or Cal. Gov't Code § 29120.

#### B. *County's Second Counterclaim—Violations of California Government Code Sections 53601, 53635, and 27000*

In the Second Counterclaim, the County alleges the Treasurer's investments were beyond the investment authority granted in Cal. Gov't Code §§ 53601 and 53635, and in violation of the Treasurer's duty to "keep safely" money deposited in his possession (Cal. Gov't Code § 27000).

##### 1. *California Government Code §§ 53601(i) and 53635(i)—Permissible Investments*

The County contends the reverse repo transactions with Fuji did not comply with permissible investments under the California Government Code. These sections authorized, in pertinent part:

> investments in repurchase agreements or reverse repurchase agreements of any securities authorized by this section so long as the proceeds of reverse repurchase agreements are invested solely to supplement the income normally received from the securities.

Cal. Gov't Code §§ 53601(i), 53635(i). The County contends the reverse repo transactions at issue were *ultra vires* of the authority granted in §§ 53601 and 53635 since they were illiquid and mismatched.

§§ 53601(i) and 53635(i) to require local legislative approval of reverse repo transactions. If the County's interpretation of § 29120 were correct, legislative approval of such agreements would have already been required as part of the budget process.

The County contends that matched repo transactions are authorized under §§ 53601 and 53635 since they allow local governments to lock in a positive spread between the cost of the reverse repo transaction and the income received from the security purchased with the proceeds of the agreement. Thus, the County argues, matched transactions are one type of reinvestment which satisfies the statutory requirement that reverse repo transactions be "solely to supplement the income normally received from these securities." Conversely, the County asserts, the illiquid mismatched transactions which the County entered into with Fuji were heavily exposed to the risk of rising interest rates and thus were not authorized under §§ 53601 and 53635.[22]

### a. *Authority to Enter Into Reverse Repo Transactions*

The California Legislature first granted local agencies authority to enter into reverse repo transactions in 1979. At that time §§ 53601(i) and 53635(i) authorized:

> Investment in repurchase agreements or reverse repurchase agreements of any securities authorized by this section.

It was under this unlimited grant of authority that the City of San Jose reinvested the proceeds from its reverse repo transactions in a variety of mismatched investments. By 1984, San Jose had lost $60 million when interest rates unexpectedly rose.

■ In response to the San Jose experience, the California legislature amended §§ 53601(i) and 53635(i). The 1985 amendments added the language "so long as the proceeds of reverse repurchase agreements are invested solely to supplement the income normally received from the securities." The

legislature's intent was to restrict the use of reverse repo transactions in hope of preventing the kind of loss San Jose had suffered. *See* Senate Bill Analysis of SB 115 (May 16, 1985); Bill Analysis Worksheet for SB 115 (June 27, 1985); Assembly Public Investments and Finance and Bonded Indebtedness Committee Report on SB 115 (August 1985).[23]

The amendment language limits the purposes for which reverse repo proceeds can be used. The parties agree the words "so long as the proceeds of the reverse repurchase agreements are invested" means the proceeds must be reinvested, i.e., cannot be used to pay capital expenditures. The parties, however, disagree over the meaning of "solely to supplement" income normally received.

The County contends that, where the repo proceeds are placed in a mismatched investment, there is a material risk the investment purchased with the proceeds will not supplement the income. Thus, the County argues, a reinvestment which is not prudent does not "solely" supplement the income and is *ultra vires*. Fuji notes the statute language does not mention a "matching" requirement nor does it require "prudent" investment. Instead, Fuji argues, the words "solely to supplement" limit the *purpose* for which reverse repo agreements can be used (i.e., to increase investment income, as opposed to paying for governmental expenditures), not the *manner* in which that purpose must be accomplished (i.e., to increase income only through "matched" reverse repo agreements).

### b. *"Legal List" or "Prudent Person" Standard*

■ In essence, Fuji asserts §§ 53601 and 53635 provide an investment structure

---

**22.** The County does not argue municipalities are limited to risk-free reinvestments. In order for a municipal investor to achieve supplemental income from the use of reverse repo transactions, some risk must be taken. Instead, the County is arguing §§ 53601 and 53635 did not authorize the Treasurer to take *unlimited* risks. According to the County, the Treasurer was only authorized to take specified investment risks which were likely to supplement the County's income.

**23.** The parties have also provided evidence of numerous Legislators' comments on amendment

of §§ 53601 and 53635. This evidence, however, is irrelevant under California law. *See, e.g., Williams v. Garcetti,* 5 Cal.4th 561, 565–69, 20 Cal.Rptr.2d 341, 853 P.2d 507 (1993) (California courts "do not consider the motives or understandings of an individual legislator even if he or she authored the statute") (internal citations omitted); *Carmona v. Division of Industrial Safety,* 13 Cal.3d 303, 312 n. 8, 118 Cal.Rptr. 473, 530 P.2d 161 (1975) (en banc) (former legislative aide's "interpretive" declaration was "entitled to little, if any, weight").

commonly known as a "legal list," while the County contends §§ 53601 and 53635 incorporate overlying "prudent person" restrictions. A "legal list" investment structure provides local governments with a simple investment rule: if it is on the list it is authorized, and if it is not on the list it is not authorized. Under the "prudent person" standard every investor is obligated to exercise the care, skill, and judgment of an ordinarily prudent person unless it either has or procures its appointment by representing that it has greater skill, in which case it is obligated to exercise such greater skill.[24] The language of the statute and the legislative history both support Fuji's "legal list" position.

Section 53601 states "the local agency may invest any portion of the money it deems wise or expedient in those investments" listed in that provision. Thus, the plain language leaves it to the local agency to determine the manner in which the allowed investments may be used, so long as the agency deems the investment "wise or expedient." This does not state a "prudent person" standard.

The legislative history supports this understanding. The goal of the 1985 amendments was not paternalistic control. Instead, it increased local government accountability for municipal investment decisions. *See* Senate Bill Analysis, May 16, 1985; Bill Analysis Worksheet for SB 115. Both the "legal list" and "prudent person" models were before the legislature when post-San Jose amendment of §§ 53601 and 53635 was under consideration. The Republican Assembly bill analysis describes "the imposition of strict 'prudent man' responsibilities on local fiscal officials" as an "alternative to [the legal list] approach" adopted in the 1985 bill. Republi-

can Analysis of SB 115 (Sept. 2, 1985). Ultimately, the 1988 Legislature considered, but declined, amendment of § 53601 to limit local agencies' investment authority to "prudent" investments. *See* Draft Assembly Bill No. 4089 (introduced Feb. 18, 1988).

The legal list approach does not exist without restriction. Section 53601 and 53635 limit the permissible types of investments available to municipalities (i.e., medium term notes, reverse repos, mortgage pass-through securities), the term to maturity of such investments (i.e., up to five years unless the governing body opts for a longer term, as the Orange County Board of Supervisors did here), the credit rating of particular investments (i.e., medium term notes rated "A" or better), and the amount of particular investments a municipality could hold (i.e., 15% of their surplus in commercial paper, or more than 10% of the paper of any one issuer).

### c. *1995 Post–Bankruptcy Amendments*

The 1995 amendments to §§ 53601(i) and 53635(i), made after the County's bankruptcy, are not retroactive. But they are informative in interpreting the pre-bankruptcy language. These amendments provide further persuasive indications that before amendment these sections did not limit investment authority to "prudent" investments.[25]

Following the Orange County bankruptcy, the California legislature considered a variety of proposed reforms ranging from eliminating the authorization for reverse repo transactions, to requiring close or even exact matching of the maturity of reinvestment to the maturity of the underlying reverse repo transaction.[26] The final enactments expanded the purposes for which reverse repos

---

**24.** An example of the California legislature's distinguishment between the "legal list" and "prudent person" models is illustrated in *Mandel v. Cemetery Board*, 185 Cal.App.2d 583, 8 Cal.Rptr. 342 (1960).

**25.** Amendments do not necessarily mean a law has been changed. California courts, however, have held where a statute is amended the amendment is presumed to effect a change in existing law, unless the legislature states a contrary intent. *See Watts v. Crawford*, 10 Cal.4th 743, 753, 42 Cal.Rptr.2d 81, 896 P.2d 807 (1995); *Victoria*

*Groves Five v. Chaffey Joint Union High Sch. Dist.*, 225 Cal.App.3d 1548, 1554, 276 Cal.Rptr. 14 (1990).

**26.** The legislature during the 1995 amendment process considered a variety of alternative matching requirements. For example, Assembly Bills 47 and 13 both proposed that "[t]he maturity of the security and the reverse repurchase agreement shall be for the same term." Exhs. 22, 23.

could be used. Under the amendments, reverse repo transactions could now be used to "supplement the yield" on securities owned *or* "to provide funds for the immediate payment of a local agency obligation."

The amendments, however, limited the manner by which these purposes could be accomplished. First, the proceeds of reverse repos can no longer be used to purchase another security with a maturity longer than 92 days from the settlement date of the reverse repo agreement, *unless* the agreement contains a written codicil guaranteeing a minimum earning or spread for the entire term of the purchased security. This provision in essence allows a mismatched transaction for up to 92 days. Second, reverse repos may no longer exceed 20% of the base value of the portfolio. Third, only securities which have been owned for a minimum of 30 days may act as collateral for a reverse repo agreement (i.e., prohibits the "stacking" of reverse repos against themselves).

Additionally, in 1995 the California Legislature enacted a "prudent person" standard. The law now provides:

> [A]ll governing bodies of local agencies or persons authorized to make investment decisions on behalf of those local agencies investing public funds pursuant to this chapter are trustees and therefore fiduciaries subject to the prudent investor standard. When investing, reinvesting, purchasing, acquiring, exchanging, selling, or managing public funds, a trustee shall act with care, skill, prudence, and diligence under the circumstances then prevailing, including, but not limited to, the general economic conditions and the anticipated needs of the agency, that a prudent person acting in a like capacity and familiarity with those matters would use in the conduct of funds of a like character and with like aims, to safeguard the principal and maintain the liquidity needs of the agency.

Cal. Gov't Code § 53600.3 (West 1997).

These material changes to the previous statutory scheme support this Court's conclusion that no "prudent person" or "matching" requirements existed in the previous code.

*See Watts v. Crawford,* 10 Cal.4th 743, 753, 42 Cal.Rptr.2d 81, 896 P.2d 807 (1995).

### d. *Sections 53601 and 53635 and Speculation*

The County contends §§ 53601 and 53635 do not authorize massive speculation with public money since speculation is not investment "solely to supplement the income normally received". According to the County, at some point an investment becomes so risky that it ceases to be "solely to supplement." Without defining the limits of a speculation rule, the County argues the Treasurer's conduct was outside the scope of authorized investment. This is a variation of the County's earlier request that the Court read a "prudent person" standard into pre–1995 California law.

Since the Treasurer had authority to enter into the reverse repo transactions, the fact some of these investments may have been "speculative," "risky," or "hopeful" does not make these transactions non-investments or *ultra vires.* Instead, it would make the Treasurer's authorized investment decisions imprudent. Finding the Treasurer's investments were authorized under §§ 53601 or 53635 does not mean these investments were suitable or prudent. Such judgements go to the manner of performance by the Treasurer, not his power to act.

### e. *Statutory purpose*

Assuming the Treasurer had the authority to enter into the reverse repos, the County contends such authority could not be exercised in a manner beyond the scope of a statute's broad purpose. Since the broad purpose of the 1985 amendments was to prevent another San Jose financial disaster, the County contends the Treasurer could not exercise his investment authority in a manner that essentially recreates the San Jose experience in Orange County.

The County relies on *Chemical Bank v. Washington Public Power Supply System,* 99 Wash.2d 772, 666 P.2d 329 (Wash.1983).[27]

---

**27.** The County also relies on *Hazell v. Hammersmith and Fulham London Borough Council,* 2

W.L.R. 372 (Eng.H.L.1991). In *Hazell* a town council in England had entered into a number of

In *Chemical Bank*, the court followed earlier Washington courts in finding "even the express power to buy and sell electricity or to acquire or construct generating facilities may not be exercised in a manner beyond the scope of that primary purpose or such a project would be ultra vires." *Id.* at 338.

■ The County correctly notes the broad purpose behind the 1985 amendments was to prevent recurrence of a financial disaster like that which took place in San Jose. Such a broad purpose, however, cannot be invoked to overcome the plain language of the statute and express intent of the legislature. Where the language of a provision is sufficiently clear in its context and not at odds with the legislative history, there is no occasion to examine the additional considerations of "policy" that may have influenced the lawmakers in their formulation of the statute. *Aaron v. SEC*, 446 U.S. 680, 695, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980) (*quoting Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 214, n. 33, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)).

[It is impermissible for a court to rely] on its understanding of the broad purposes ... [N]o legislation pursues its purposes at all costs. Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice—and it frustrates rather than effectuates legislative intent simplistically to assume that whatever furthers the statute's primary objective must be the law.

*Rodriguez v. United States*, 480 U.S. 522, 525–26, 107 S.Ct. 1391, 94 L.Ed.2d 533 (1987).

### f. Conclusion

■ California law presumes a statute does not contain restrictions or qualifications if none are plainly stated in the text. *See Tiernan v. Trustees of Cal. State Univ. & Colleges*, 33 Cal.3d 211, 219, 188 Cal.Rptr.

115, 655 P.2d 317 (1982) ("[I]f the Legislature had intended to limit the statute's reach, it would have clearly said so"). Sections 53601 and 53635 set forth a list of financial transactions in which a county is legally authorized to engage. Neither the language nor the legislative history of these sections provide a basis for concluding these sections restrict what *risks* a county is authorized to incur.

In enacting §§ 53601(i) and 53635(i) the Legislature granted the authority to invest, and left to local governments the responsibility to make their own risk decisions. Section 53601 states the local agency, or by delegation the Treasurer, is to decide whether such investments are "wise or expedient."

An *ultra vires* act is one "performed without any authority to act." An error in the exercise of that authority is insufficient to support an *ultra vires* claim. *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 690, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949). The Court holds the Treasurer was authorized under Cal. Gov't Code §§ 53601 and 53635 to enter into the reverse repo transactions at issue. He may have made grave errors in determining whether such investments were wise or expedient. But, questions of speculation and prudence go to the *manner* of performance rather than the *power* to act.

### 2. Calif.Gov't Code § 27000

■ The County contends Cal. Gov't Code § 27000 is a source of authority which, in conjunction with §§ 53601 and 53635, defines the boundaries of the Treasurer's investment power. Section 27000 states:

The county treasurer shall receive and keep safely all money belonging to the county and all other money directed by law to be paid to him and apply and pay it out, rendering the account as required by law.

---

swap transactions to both speculate and hedge on the movement of market interest rates. The County cites *Hazell* for the proposition that, since swap transactions were not prudent, such transactions are outside the council's borrowing authority. Opp. at 151. *Hazell* does not so hold.

Rather, the council was held to have legal capacity to enter into contracts "calculated to facilitate ... the discharge of the local authority's function of borrowing ." Since swap transactions were not borrowing, they were beyond the scope of the authority granted to the town council by statute.

Section 27000 makes no mention of the Treasurer's power or authority to invest or reinvest. Moreover, there is no case discussing or implying that § 27000 independently empowers a treasurer to invest.[28]

The County concedes § 27000 is not an independent basis of the Treasurer's authority. ML—Opp. at 155 n. 121. Nevertheless, the County contends §§ 27000, 53601, and 53635 together form the basis for the authority. Sections 53601 and 53635 are legal authorization to enter into reverse repurchase agreements, but they do not support a grant of authority through § 27000.

Instead, the Treasurer's authority to invest depends on §§ 53601 and 53635 in conjunction with § 53607. Section 53607 states "[t]he authority of the legislative body to invest or to reinvest funds of a local agency, or to sell or exchange securities so purchased, may be delegated by the legislative body to the treasurer of the local agency[.]"

The legislature's enactment of §§ 27000.1 and 20000.3 in 1995 supports this conclusion. Section 27000.1 provides only "[t]he board of supervisors may, by ordinance, delegate to the county treasurer the authority to invest or reinvest the funds of the county[.]" Section 27000.1 would be superfluous if the power to invest already belonged to the treasurer through § 27000. Additionally, newly enacted § 27000.3 provides "[n]othing in this chapter is intended to grant investment authority to any person or governing body except as provided in sections 53601, 53607, and 53635." This clarifies that the authority does not flow through § 27000.

The Court concludes § 27000 is not a source of authority, independently or otherwise, and cannot be a basis of an *ultra vires* claim by the County. Since the reverse repo transactions at issue here were within the authority granted by Cal. Gov't Code §§ 53601 and 53635, and § 27000 is not a source of authority, Summary Adjudication on the County's Second Counterclaim is GRANTED in Fuji's favor.[29]

## C. County's Third Counterclaim—Negligence and Negligence Per Se

■ To the extent the Third Counterclaim is founded on the *ultra vires* issues raised in the First and Second Counterclaims, Summary Adjudication on the Third Counterclaim is GRANTED in Fuji's favor.[30]

---

**28.** The neighboring statutory framework can be informative in determining the meaning of a provision. *See Moyer v. Workmen's Comp. Appeals Bd.*, 10 Cal.3d 222, 230, 110 Cal.Rptr. 144, 514 P.2d 1224 (1973) (finding statutes should be construed in light of the statutory framework as a whole). Cal. Gov't Code §§ 27000–27121 contains no grant of investment authority. The County notes, however, that two sections mention investments. Section 27005 provides "[t]he treasurer shall disburse the county money and all other money placed in his or her custody by official authority only on county warrants, checks, or electronic fund transfers issued by the county auditor, except for the making of legal investments." Similarly, § 27013 permits the treasurer to deduct costs from any returns made on the investments of county funds. Neither of these sections, however, *authorize* the Treasurer to make investments. Rather, these sections refer to how authority to invest (which has been granted elsewhere in the Code) should be exercised.

**29.** In the previous briefing the County also argued Merrill Lynch had violated § 27000 because, in part, the Treasurer's portfolio contained instruments whose value fluctuated over time, but he nonetheless permitted investors to withdraw their funds at par. This "allow[ed] one group of depositors to withdraw funds such that they not only avoid[ed] losses but actually increase[d] the risk of loss to those who remain[ed.]" ML—Opp. at 142. Merrill Lynch only addressed this claim briefly since it had not been properly pled in the complaint. Here, the Second Amended Complaint against Fuji has properly raised the claim, but the parties have not joined issue on the claim. Absent briefing, the Court declines to rule whether Fuji's conduct violated Cal. Gov't Code § 27000.

**30.** In light of this holding, the Court need not address the merits of Defendants' Validating Acts argument.

Additionally, the County claims Fuji violated Central District Local Rule 7.14 by failing to file a Statement of Genuine Issues in opposition to the County's motion. Fuji did file a Statement of Uncontroverted Facts and Conclusions of Law in Support of its Cross Motion for Partial Summary Judgment. The issues raised in the County's Motion for Summary Judgment are identical to the issues raised in Fuji's cross motion. The Court finds there was substantial compliance with the Local Rules.

### III. DISPOSITION

For the reasons stated, summary adjudication is GRANTED in favor of Fuji Securities Inc. on the *ultra vires* issues.